ANTONIO R. BARCELÓ y MIGUEL MARTORELL, peticionarios, *v.* EDUARDO J. SALDAÑA, SECRETARIO EJECUTIVO DE PUERTO RICO, demandado.

No. 271.—*Sometido:* Abril 2, 1931. *Resuelto:* Mayo 20, 1931.

*Antonio R. Barceló, M. A. Martínez Dávila, Miguel Guerra Mondragón, Cayetano Coll y Cuchí, Luis Llorens Torres, E. Ramos Antonini y Angel Arroyo Rivera,* abogados de los peticionarios; *Hon. Attorney General James R. Beverley* y *T. Torres Pérez,* abogados del demandado; *J. Valldejuli Rodríguez,* como *amicus curiae.*

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

El 18 de febrero de 1931, Antonio R. Barceló y Miguel

Martorell, alegando ser los candidatos nominados por el partido Unión de Puerto Rico, para los cargos de Comisionado Residente de Puerto Rico en Washington y Miembro de la Junta de Revisión e Igualamiento de Puerto Rico, respectivamente, y alegando además, que Eduardo J. Saldaña, Secretario Ejecutivo de Puerto Rico, se había negado como tal a registrar e inscribir sus candidaturas en los libros de su oficina, a fin de certificarlas y remitirlas en su oportunidad a la Junta Insular de Elecciones de Puerto Rico, para ser impresas en la papeleta electoral que habrá de usarse en las elecciones generales de 1932, solicitaron de esta Corte Suprema que expidiera un auto de *mandamus* dirigido al dicho Eduardo J. Saldaña, Secretario Ejecutivo de Puerto Rico, ordenándole que hiciera lo que se había negado a hacer, ya que lo que se le había pedido constituía el cumplimiento por su parte de un deber ministerial resultante de su cargo o empleo.

Examinada la solicitud, se expidió un mandamiento dirigido al Secretario Ejecutivo para que compareciera ante la corte el 26 de febrero de 1931, a mostrar causa, si alguna tuviere, a virtud de la cual no debiera expedirse el auto solicitado.

En el día señalado compareció el secretario y formuló su contestación por escrito oponiéndose al libramiento del auto. Comparecieron también los peticionarios. La "Alianza Puertorriqueña, de los partidos Unión de Puerto Rico y Republicano Puertorriqueño", representada por su Presidente Rafael Cuevas Zequeira, solicitó permiso para intervenir como parte interesada en el procedimiento. Se opusieron los peticionarios y la corte, vista la ley especial sobre la materia, negó la intervención, pero permitió a la "Alianza" comparecer como *amicus curiae*. Informaron oralmente los abogados de los peticionarios, del Secretario Ejecutivo y del *Amicus Curiae*. Presentaron su prueba los peticionarios y el demandado, terminando la vista al día siguiente, 27 de febrero de 1931. Tanto los peticionarios como

el demandado enmendaron su solicitud los primeros y su contestación el segundo, sustituyendo dichos documentos enmendados los primitivamente archivados. En vez de nuevos informes orales, se acordó que las partes y el *amicus curiae* presentaran alegatos por escrito, como los presentaron, en efecto, quedando el caso finalmente sometido a la decisión del tribunal, el 2 de abril de 1931.

A nuestro juicio la solicitud de *mandamus* debe ser denegada. Expondremos las razones que tenemos para ello. Las conclusiones de hecho se entresacan de las alegaciones y las pruebas. La ley reguladora del caso es breve y sencilla. La jurisprudencia sería susceptible de un estudio mucho más amplio del que el tiempo de que disponemos nos permitirá hacer. Eso no obstante nos referiremos a la fundamental aplicable.

En el año de 1924 existían en la Isla de Puerto Rico como partidos políticos principales, debidamente constituídos, la "Unión de Puerto Rico" y el "Republicano Puertorriqueño". Ambos celebraron asambleas para tratar de cierto movimiento de acercamiento iniciado por sus jefes. La del primero tuvo lugar en San Germán. La del segundo en Mayagüez. Como resultado quedó concertada una coalición bajo el nombre de "Alianza Puertorriqueña", de acuerdo con las siguientes bases:

". . . (b) La Alianza Puertorriqueña asumirá y ejercitará todos los poderes y prerrogativas que competen a los dos partidos históricos de Puerto Rico, denominados partido Unión de Puerto Rico y Republicano Puertorriqueño.

"(c) La Alianza Puertorriqueña encaminará todos sus esfuerzos a la consagración del pleno gobierno propio para alcanzar la soberanía del Pueblo de Puerto Rico, dentro de la soberanía de los Estados Unidos. . .''

A virtud del pacto, quedó constituído el organismo directivo central de la "Alianza" por quince miembros propietarios y quince suplentes, siete de ellos, propietarios y suplentes, designados por la asamblea del partido "Unión

de Puerto Rico", de una lista de veinte y uno suministrada por la asamblea del partido "Republicano Puertorriqueño", y otros siete, propietarios y suplentes, designados por la Asamblea del partido "Republicano Puertorriqueño", de una lista de veinte y uno suministrada por la asamblea del partido "Unión de Puerto Rico", debiendo designarse el miembro restante, propietario y suplente, unánimemente por los catorce miembros propietarios.

La constitución de los comités locales se pactó en forma semejante: siete miembros, de ellos tres unionistas, tres republicanos y el séptimo designado por el Comité Directivo Central. Expresamente se acordó que "El Comité Directivo elegirá los miembros de los comités locales de la Coalición dentro de las personas que formen, en los respectivos municipios, el organismo local de dicho partido, siempre que puedan encontrarse personas afectas a la coalición; en otro caso podrá ser la elección, en todo o en parte, fuera de los Comités. Los miembros de cada partido en dichos Comités asumirán las funciones correspondientes al partido que representen a los efectos de las leyes electorales y municipales."

Los miembros del Comité Directivo de la "Alianza" designados unánimemente por la asamblea de la "Unión de Puerto Rico", fueron: Propietarios: Antonio R. Barceló, Jesús Benítez, Alfonso Lastra Charriez, Arturo González Prado, Arsenio Martínez, Miguel Guerra-Mondragón y Nicolás Santini. Suplentes: Juan Hernández López, José Castillo, Emilio González, José F. Aponte, Genaro Cautiño, Adriano González y Carlos Brunet del Valle.

El acta de la Asamblea General Extraordinaria de la "Unión de Puerto Rico" celebrada en San Germán en los días 4 y 5 de mayo de 1924, termina así:

"A propuesta del señor Barceló, fué acuerdo enviar un saludo fraternal a los asambleístas republicanos reunidos en la ciudad de Mayagüez, y a su ilustre Presidente, así como a los veteranos consejeros de la Unión señores Francisco de Paula Acuña, Eduardo Giorgetti y Cayetano Coll y Toste. También, a moción del señor Barceló, fué

acuerdo consignar en acta un voto de gracias para el Comisionado de Puerto Rico, residente en Washington, señor Córdova Dávila, por la patriótica labor que viene realizando en pro de los intereses de Puerto Rico.

"Los señores Rafael Cuevas Zequeira y Juan Hernández López, pronuncian elocuentes discursos exaltando el patriotismo demostrado por las asambleas de los dos partidos históricos constituyendo la Alianza Puertorriqueña, y clausuró el acto el señor Barceló con estas palabras pronunciadas en Ponce por el fenecido patricio don Román Baldorioty de Castro en la célebre asamblea en que se constituyó el partido autonomista puertorriqueño: 'Gloria a Dios en las alturas y paz en la tierra a los hombres de buena voluntad.'

"Y se disolvió la asamblea."

Con esas palabras se cierran las actuaciones del partido "Unión de Puerto Rico" separadamente, según el libro oficial en que se deja constancia de ellas, presentado como prueba por los mismos peticionarios. Figuran a la página 126 de dicho libro. El próximo asiento, que comienza a la página 127, está fechado más de cinco años después, el 2 de agosto de 1929.

Así las cosas, celebrada la coalición, el comité directivo central comenzó a actuar en seguida, y constituídos los comités locales, se desarrolló a través de ellos la vida de la nueva organización política formada.

En el propio año de 1924 celebráronse elecciones generales en Puerto Rico y a ellas acudió la "Alianza Puertorriqueña", conservando su personalidad los partidos que la formaban, presentando cada uno sus candidatos, que figuraron en la papeleta electoral bajo el nombre e insignia de cada partido. Los candidatos eran los mismos y recibieron bajo el símbolo de la Unión 132,755 votos y bajo el del partido Republicano 30,286. En esas elecciones generales de 1924, concurrieron además a las urnas, los partidos "Socialista" y "Constitucional Histórico" que depositaron bajo sus símbolos respectivos 56,103 y 34,576 votos. Sólo 1,041 votantes más intervinieron, representando otras organizaciones políticas.

232

Una mayoría completa, que dió a los partidos Unionista
y Republicano coaligados en la "Alianza" el control abso-
luto del Senado y de la Cámara por un período de cuatro
años fué, pues, el resultado final de las elecciones de 1924.
Cómo se desenvolvió y actuó la "Alianza" durante ese pe-
ríodo no consta por completo de los autos. El libro que debe
dar fe de sus actos oficiales, no está ante nosotros. La
"Alianza" no es parte en este procedimiento. Lo que sí apa-
rece de los autos es que constituída la Legislatura de tal
modo, esto es, con una mayoría absoluta aliancista, pasó una
ley que fué aprobada el 7 de mayo de 1927, a virtud de la
cual la Ley Electoral fué enmendada, quedando sus secciones
40 y 42 redactadas como sigue:

"Sección 40.—Ninguna persona podrá ser candidato para más
de un cargo ni para un mismo cargo en dos o más candidaturas dis-
tintas. Si hubiese sido nombrada para dos o más cargos en una o
más candidaturas, o para un mismo cargo en dos o más candidaturas,
elegirá aquel y aquella en que prefiera que su nombre aparezca como
candidato. Si el candidato dejare de hacer dicha elección con ante-
rioridad a las doce del día del treinta de septiembre, se designará su
nombre en la candidatura y para el cargo a que fué propuesto pri-
meramente. Si fuere imposible determinar el cargo o la candidatura
para que hubiese sido primeramente propuesto, entonces será desig-
nado para aquel o aquella en que figure en primer lugar en la peti-
ción o certificación en que se nombre."

"Sección 42.—El nombre y emblema que usaren para distinguirse
en las papeletas electorales cada uno de los partidos políticos princi-
pales u organizados, serán los mismos que usaron dichos partidos en
las precedentes elecciones, a menos que se notifique un cambio de nom-
bre o emblema al Secretario Ejecutivo de Puerto Rico en o antes del
día 20 de septiembre del año de las elecciones en las cuales deberán
usarse.

"Ningún partido político adoptará como nombre o emblema un
nombre o emblema que se hubiere usado o adoptado previamente por
otro partido político, en todo o en parte, si ese otro partido todavía
reclama y usa dicho nombre o emblema. Ningún partido político em-
pleará como divisa en las papeletas electorales la bandera o el escudo
de armas de los Estados Unidos o de Puerto Rico. El Secretario
Ejecutivo de Puerto Rico queda por la presente autorizado para ne-

garse a aceptar y se le ordena que se niegue a aceptar cualquier nombre o emblema de un partido político que fuere presentado para su registro o archivo en su oficina que infrinja las disposiciones de esta sección. Si cualquier partido político dejare de registrar un emblema con el Secretario Ejecutivo de Puerto Rico, en o antes del día 20 de septiembre del año de las elecciones en que hubiere de emplearse, según se requiere por esta Ley, el Secretario Ejecutivo designará un emblema para ese partido, el cual emblema deberá usarse para distinguir a dicho partido en la papeleta oficial.

"Cualquier partido político principal u organizado que quisiese cambiar su nombre o divisa podrá hacerlo mediante una certificación del organismo director central de dicho partido radicada en la Secretaría Ejecutiva, sin que por esto tal partido pierda los derechos y privilegios que la ley le concede como tal partido principal u organizado; *Disponiéndose,* que los partidos que en las elecciones anteriores fueron a las urnas aliados o coaligados, inscribiendo candidaturas separadas en las cuales figuraban en todo o en parte los mismos candidatos para iguales cargos, podrán inscribir en la Secretaría Ejecutiva de Puerto Rico, a petición del organismo central directivo de dicha alianza o coalición, un nombre general para dicha alianza o coalición y una insignia que contenga las insignias de cada uno de los partidos aliados o coaligados, y debajo de la misma se inscribirá una sola candidatura de acuerdo con las prescripciones de la sección 40 de la Ley Electoral y de Inscripciones tal y como ha sido enmendada por la presente; *Disponiéndose, además,* que la alianza o coalición que concurra a las urnas bajo un mismo nombre o divisa tal y como se determina en el *'Disponiéndose'* anterior, será considerada como un solo partido con las mismas prerrogativas, derechos y deberes, que de acuerdo con la ley, tienen los partidos que la integran, y en lo sucesivo será considerada como partido principal u organizado, de acuerdo con el número de votos que obtenga en la elección, según se prescribe en esta Ley.

"El 20 de septiembre, o antes, del año en que se celebraren unas elecciones, cada candidato para Senador por acumulación o Representante por acumulación podrá presentar al Secretario Ejecutivo de Puerto Rico una divisa sencilla y distinguible para que se coloque al lado de su nombre en la papeleta electoral. Ningún candidato por acumulación podrá usar divisa alguna que sea igual o similar a la divisa que se hubiere previamente adoptado y registrado, y el derecho al uso de la cual todavía se reclama por otro candidato o partido político. Ningún candidato empleará como divisa la bandera o el

escudo de armas de los Estados Unidos o de Puerto Rico. La prioridad en el orden de presentación de las divisas, se determinará por las fechas en que se presenten al Secretario Ejecutivo de Puerto Rico para ese fin. Si dos o más divisas iguales o similares en todo o en parte, le fueren presentadas al mismo tiempo, el Secretario Ejecutivo decidirá por sorteo a cuál de ellas corresponde la prioridad. Dicho sorteo se verificará a presencia de las personas o partes afectadas e interesadas, o de sus representantes, quienes deberán residir en San Juan. Dichos representantes serán designados por las personas o partes interesadas en todos los casos en que dichas personas o partes no archiven sus divisas personalmente.

"El Secretario Ejecutivo enviará el 26 de septiembre del año en que se celebraren elecciones, a la Junta Insular de Elecciones, una relación certificada de las divisas de todos los partidos políticos y de los candidatos por acumulación, para ser impresas en las papeletas electorales de aquel año, y dicho certificado irá acompañado de dibujos hechos *ad hoc*, de aquellas divisas que fueren distintas a las que se hubieren usado en las elecciones precedentes.''

Vigente la enmienda, el Comité Directivo de la ''Alianza Puertorriqueña'', adoptó la siguiente

## ''RESOLUCION

''Por cuanto: En virtud de resoluciones idénticas, aprobadas por las asambleas generales de los partidos 'Unión de Puerto Rico' y 'Republicano Puertorriqueño', celebradas en las ciudades de San Germán y Mayagüez en los días 5 y 6, y 3, 4, y 5 de mayo de 1924, respectivamente, dichos partidos constituyeron una alianza o coalición política bajo el nombre de 'Alianza Puertorriqueña';

''Por cuanto: De acuerdo también con resoluciones aprobadas por dichas asambleas, la 'Alianza Puertorriqueña' asumiría y ejercería todos los poderes y prerrogativas que competen a los dos partidos históricos de Puerto Rico, denominados 'Partido Unión de Puerto Rico', y 'Partido Republicano Puertorriqueño';

''Por cuanto: El Comité Directivo de la 'Alianza Puertorriqueña' fué autorizado para determinar la forma de llevar al ticket electoral los candidatos de la misma, entendiéndose que los partidos aliados habrían de conservar su personalidad, nombres e insignias respectivas;

''Por cuanto: La sección 42 de la Ley Electoral y Inscripciones, según fué enmendada por la Ley de 7 de mayo de 1927, dispone que—

'' 'Cualquier partido político principal u organizado que quisiese

cambiar su nombre o divisa podrá hacerlo mediante una certificación del organismo director central de dicho partido radicada en la Secretaría Ejecutiva, sin que por esto tal partido pierda los derechos y privilegios que la ley le concede como tal partido principal u organizado; *Disponiéndose,* que los partidos que en las elecciones anteriores fueron aliados o coaligados, inscribiendo candidaturas separadas en las cuales figuraban en todo o en parte los mismos candidatos para iguales cargos, podrán inscribir en la Secretaría Ejecutiva de Puerto Rico, a petición del organismo central directivo de dicha alianza o coalición, un nombre general para dicha alianza o coalición, y una insignia que contenga las insignias de cada uno de los partidos aliados o coaligados, y debajo de la misma se inscribirá una sola candidatura de acuerdo con las mismas prescripciones de la sección 40 de la Ley Electoral y de Inscripciones tal y como ha sido enmendada por la presente; *Disponiéndose, además,* que la alianza o coalición que concurra a las urnas bajo un mismo nombre o divisa tal y como se determina en el *'Disponiéndose'* anterior, será considerada como un solo partido con las mismas prerrogativas, derechos y deberes, que de acuerdo con la ley tienen los partidos que la integran, y en lo sucesivo será considerada como partido principal u organizado, de acuerdo con el número de votos que obtenga en la elección, según se prescribe en esta Ley.'

"Por cuanto: El Partido 'Unión de Puerto Rico' y el partido 'Republicano Puertorriqueño' fueron aliados a las urnas en las elecciones de 1924, inscribiendo candidaturas separadas por cada partido, pero conteniendo los mismos candidatos para todos los cargos que se votaron en dichas elecciones;

"Por cuanto: Es procedente que uno y otro partido inscriban en la Secretaría Ejecutiva de Puerto Rico dicha Alianza con el nombre ya adoptado para la misma, o sea 'Alianza Puertorriqueña', con el fin de que figure en el ticket electoral como un partido político y bajo la insignia o emblema de dicha Alianza Puertorriqueña se inscriban todos los candidatos de la misma, de acuerdo con las prescripciones de la sección 40 de la Ley Electoral y de Inscripciones, asumiendo la 'Alianza Puertorriqueña' todos los derechos, privilegios y prerrogativas que por las leyes correspondan a los referidos partidos aliados, 'Unión de Puerto Rico' y 'Republicano Puertorriqueño';

"Por cuanto: Es pertinente adoptar como emblema o insignia de la 'Alianza Puertorriqueña' el ya adoptado anteriormente por el Comité Directivo e inscrito en la Secretaría Ejecutiva de Puerto Rico, o sea:

" 'Una balanza con sus platillos al fiel, que tenga sobre sí el nom-

bre 'Alianza Puertorriqueña' y que integre al propio tiempo los nombres de los dos partidos históricos: "Unión de Puerto Rico" y "Republicano Puertorriqueño", con sus respectivas insignias: las dos manos y el águila.'

"POR TANTO, *Resuélvese por el Comité Directivo de la Alianza Puertorriqueña:*

"1. Solicitar del Secretario Ejecutivo de Puerto Rico que inscriba la coalición o conjunción de los partidos 'Unión de Puerto Rico' y 'Republicano Puertorriqueño' bajo el nombre común de 'Alianza Puertorriqueña', asumiendo ésta todos los derechos, privilegios y prerrogativas que por las leyes corresponden a los referidos partidos con el fin de inscribir bajo la referida insignia de la Alianza Puertorriqueña en la papeleta electoral, que haya de votarse en las próximas elecciones generales, los candidatos elegidos por la Alianza Puertorriqueña de acuerdo con su reglamento y con las prescripciones de la Ley Electoral; para todos los cargos que hayan de votarse en dichas elecciones.

"2. Inscribir en la Secretaría Ejecutiva de Puerto Rico como insignia o emblema de la 'Alianza Puertorriqueña', el siguiente:

" 'Una balanza con sus platillos al fiel, que tenga sobre sí el nombre de "Alianza Puertorriqueña" y que *integre al propio tiempo* los nombres de los dos partidos históricos: "Unión de Puerto Rico" y "Republicano Puertorriqueño", con sus respectivas insignias: las dos manos, y el águila.'

"3. Que la presente resolución sea comunicada al Gobernador de Puerto Rico, al Secretario Ejecutivo, a la Junta Insular de Elecciones, a los Comités Locales de la Alianza Puertorriqueña, y al público en general."

Esa resolución fué ratificada en una asamblea de la "Alianza", celebrada en el teatro municipal de San Juan el 26 de agosto de 1928, así:

"B.—Ratificar el acuerdo del Comité Directivo de 'La Alianza Puertorriqueña' de fecha 13 de marzo del 1928, comunicado al Secretario Ejecutivo de Puerto Rico, y en tal virtud 'La Alianza Puertorriqueña', acudirá a las urnas bajo un solo ticket e insignia ya adoptado y registrado, con el nombre oficial de 'Alianza Puertorriqueña de los partidos Unión de Puerto Rico y Republicano Puertorriqueño', quedando de este modo como patrimonio de 'La Alianza' los nombres históricos de los dos partidos aliados, al igual que sus símbolos, personalidad, derechos y prerrogativas.

"Que el Comité Directivo de la Alianza Puertorriqueña, en su sesión de 28 de agosto de 1928, resolvió usar como nombre abreviado de su colectividad el de 'Alianza Puertorriqueña', y bajo tal nombre abreviado radicará en la Secretaría Ejecutiva de Puerto Rico todos los certificados de convenciones."

La ratificación fué también comunicada oficialmente al Secretario Ejecutivo de Puerto Rico, por el Secretario del Comité Directivo de la "Alianza Puertorriqueña".

El 4 de septiembre siguiente trasmitiéronse al Secretario Ejecutivo de Puerto Rico unos ciento veinte y cinco "certificados de convención" firmados unos ochenta y dos por Antonio R. Barceló, Presidente, y Frank A. Martínez, Secretario, y unos cuarenta y tres por Félix Córdova Dávila, Presidente, y Frank A. Martínez, Secretario. Transcribiremos lo pertinente de uno de los firmados como Presidente por Félix Córdova Dávila y otro de los firmados como Presidente por Antonio R. Barceló:

"ALIANZA PUERTORRIQUEÑA

"Apartado 84

"San Juan, P. R.

"Certificado de Convención

"Los que suscriben, Presidente y Secretario de la Convención celebrada por el Partido 'Alianza Puertorriqueña' en San Juan, Puerto Rico,

"Certifican: que reunidos, previa convocatoria, los miembros que constituyen dicha convención, al objeto de nominar los candidatos de la 'Alianza Puertorriqueña' para los cargos de Comisionado Residente en los Estados Unidos, Senadores y Representantes al. large y miembros de la Junta de Revisión e Igualamiento, que deberán figurar en el ticket en las próximas elecciones de noviembre, se llevó a cabo la votación entre los concurrentes, resultando proclamados, después del escrutinio, los señores siguientes:

"Para Comisionado Residente en los Estados Unidos: Félix Córdova Dávila.

"Para Senadores al large (por acumulación); Antonio R. Barceló, Juan Hernández López, Juan B. Soto.

"" *          *          *          *          *          *          *

238

"Y, para remitir al Secretario Ejecutivo de Puerto Rico, en cumplimiento de lo que dispone la sección 36 de la Ley Electoral vigente, · firmamos la presente en San Juan, Puerto Rico, a 28 de agosto de mil novecientos veintiocho.

"Félix Córdova Dávila, Presidente—Frank A. Martínez, Secretario."

## "ALIANZA PUERTORRIQUEÑA

### "Certificado de Convención

"Los que suscriben, Presidente y Secretario de la Convención celebrada por el partido 'Alianza Puertorriqueña' en el municipio de Ponce,

"Certifican, que reunidos los compromisarios de este municipio, previa convocatoria, al objeto de nominar los candidatos de la Alianza Puertorriqueña para los cargos de alcalde y miembros de la asamblea municipal que deberán figurar en el ticket en las próximas elecciones de noviembre, se llevó a cabo la votación entre los concurrentes, resultando nombrados candidatos, después del escrutinio, los señores siguientes:

"Para Alcalde, Guillermo Vivas Valdivieso.

"* &ast; &ast; &ast; &ast; &ast; &ast;

"Y, para remitir al Secretario Ejecutivo de Puerto Rico, en cumplimiento de lo que dispone la sección 36 de la Ley Electoral vigente, firmamos la presente en San Juan, P. R., a los 31 días del mes de agosto de 1928.

"Antonio R. Barceló, Presidente—Frank A. Martínez, Secretario."

Los otros certificados son prácticamente iguales.

También se enviaron al Secretario Ejecutivo por la "Alianza Puertorriqueña" con los dichos certificados, ciertos documentos relativos a algunas sustituciones. Transcribiremos uno de ellos. Dice:

"Yauco, P. R., septiembre_____de 1926.
"Hon. Secretario Ejecutivo de P. R.
"Señor:

"Por la presente hago constar que acepto la designación que se me hace para sustituir al Sr. Pedro Olivari como miembro de la Asamblea Municipal por el Partido 'Alianza Puertorriqueña'.

"Respetuosamente, Pedro M. Franceschi."

Con toda esa documentación como base y con la que necesariamente tuvieron que aportar los otros partidos de la Isla, preparóse el modelo de papeleta general oficial para las elecciones de 1928. Sólo tres columnas contiene.

En la primera, bajo la insignia oficial de la "Alianza" figuran los candidatos de la "Alianza Puertorriqueña de los Partidos Unión de Puerto Rico y Republicano Puertorriqueño". En la segunda, bajo las insignias del brazo sosteniendo la antorcha y del elefante, aparecen los candidatos del "Partido Socialista-Constitucional". La tercera no tiene divisa y está destinada a "Candidatos Independientes".

Celebradas las elecciones en noviembre del dicho año 1928 y recontados los votos, se encontró que 132,826 electores marcaron los suyos en la columna de la "Alianza Puertorriqueña de los Partidos Unión de Puerto Rico y Republicano Puertorriqueño", sin que sea posible distinguir su origen. Votaron en una sola columna, bajo un solo nombre y una sola divisa, formada ésta es verdad de atributos de viejas divisas, pero integradas dentro de otro nuevo, consistente en una balanza que generalmente simboliza la idea de la justicia. Bajo la columna del "Partido Socialista-Constitucional" votaron 123,415 electores, consignando sus votos en la tercera columna sólo noventa y cuatro personas.

Y así quedó, a nuestro juicio, expresado desde 1928 al interpretar la misma ley aplicable a éste, en el caso de *Martínez Nadal v. Saldaña, Secretario Ejecutivo,* 38 D.P.R. 446, 449, consagrada la creación de un nuevo partido o entidad política que por razón del número de sus votos siguió no sólo ostentando la condición de partido principal sino de partido de la mayoría en Puerto Rico.

Es evidente que surgieron desavenencias en el seno de la "Alianza" después de las elecciones de 1928. Los peticionarios no han presentado prueba clara sobre el origen de dichas desavenencias. Si bien introdujeron el Libro de Actas a que ya nos hemos referido, se limitaron a presentar específicamente tres de ellas como prueba, la de la Asamblea

de San Germán, 1924, la de la antigua Junta Central del Partido Unionista, 1929, y la de la Asamblea del llamado Partido Unionista de 24–26 agosto, 1929. La de la primera reunión de los "miembros unionistas del Directorio de la Alianza" fué omitida. Sin embargo, no obstante ser ello así, no obstante tratarse de un procedimiento en el cual con excepción de los documentos que tenía ya en su poder el Secretario Ejecutivo, toda la prueba nueva aportada ha estado bajo el absoluto control de la parte que solicita el remedio, hay bastante en los autos para concluir que dichas desavenencias no sólo surgieron después de las elecciones de 1928, si que no se originaron entre los grupos de diverso origen como tales grupos, sino entre los líderes de ambas procedencias ya entrelazados y confundidos en el seno de la colectividad. Propusieron unos que el conflicto se sometiera al juicio y resolución de una asamblea de la "Alianza" tal como estaba ésta constituída. No se avino a ello el señor Barceló que sostenía que debía convocarse a una asamblea de cada partido para que dicha asamblea trazara el rumbo a seguir en el futuro. No hubo acuerdo. Y aparece convocada, según el libro de actas presentado a sesión la "Junta Central del Partido Unión de Puerto Rico (que quedó en tregua al establecerse la Alianza o pacto con el Partido Republicano Puertorriqueño en la asamblea de San Germán el 4 de mayo de 1924) conjuntamente con los miembros unionistas del Directorio."

Quisiéramos transcribir íntegramente el acta, pero ello alargaría de modo extraordinario esta opinión. Transcribiremos sólo una parte. El miembro propietario de la antigua Junta Central, José L. Berríos, leyó el siguiente escrito:

"Distinguidos compatriotas:—Estoy aquí honrándome mucho con estarlo, para deciros con toda franqueza que no soy unionista, sino en el seno de la Alianza Puertorriqueña. Después de haber guardado silencio durante la llamada Tregua de Dios y durante la última asamblea celebrada antes de las elecciones en que tácitamente se realizó (y creo que expresamente también) la fusión de las dos ramas

aliancistas, me sería muy doloroso desandar el camino andado, lleno de sinsabores y de sacrificios, por cuestiones personales en que el excesivo amor propio prevalece. No· sé qué juicio podrían hacer de nosotros los hombres sensatos, plenos de patriotismo, si rompiésemos filas en estos momentos supremos para Puerto Rico en que han de solucionarse los .problemas más complicados que nos han salido al paso para dar paso franco a los adversarios y a los enemigos, acechadores irreductibles de nuestras destemplanzas para aprovecharse de ellas con grave perjuicio para nuestros más altos ideales. Estimo que en *caucus* de aliancistas, de vosotros como unionistas y de otros distinguidos correligionarios también; pero de procedencia republicana, procediendo todos serenamente, sin prejuicios, recordando que somos puertorriqueños y ahora más que en ninguna época pasada porque nunca hemos sufrido más vicisitudes que las que estamos sufriendo, necesita Puerto Rico del concurso inteligente, activo y reflexivo de sus mejores ciudadanos para buscar remedios que curen los muchos. males que padecemos, con un poco de sacrificio de nuestra vanidad y de lo que llamamos amor propio, bien podría llegarse a una solución. satisfactoria en que no habrían vencidos y sola vencedora la Isla que: contempla espectacularmente nuestras disenciones.

"Perdonad estas humildes indicaciones y que Dios os ilumine."

El Presidente, Sr. Barceló, "manifiesta que la cuestión levantada por el Sr. Berríos no está en orden. 'Estamos aquí reunidos', dice, 'vamos a deliberar, vamos a adoptar algunos acuerdos, bien sea en pro o en contra de todo lo que dice el Sr. Berríos.''

Seguidamente habló, según el acta, por espacio de dos horas, el Sr. Barceló. . Terciaron otras personas en la discusión y presentóse una moción que fué aprobada por mayoría "convocando una asamblea magna del Partido Unión de Puerto Rico". Los Sres. Benítez Castaño y José L. Berríos que no estuvieron conformes, presentaron al Secretario para. que constara en acta la siguiente explicación de su voto ne-.gativo. Es así:

"Por cuanto, después de un cuidadoso estudio de las cuestiones: planteadas ante las personas que integraban la Junta Central de la. Unión de Puerto Rico, cuando tuvo efecto la constitución de la Alianza Puertorriqueña, cuya cuestión no es otra, que la de resolver si debe-

o no convocarse a una asamblea del partido Unión de Puerto Rico para decidir de su futura suerte;

"Por cuanto, que, en el orden moral como resultado de las prédicas que se han venido haciendo al pueblo, la fusión está prácticamente hecha, y estamos obligados a ser consecuentes con los principios que hemos venido sosteniendo;

"Por cuanto, que, en el orden legal, después del acuerdo (tomado en la asamblea de la Alianza de 1928 (apartado B del artículo IX) del programa de ésta) los dos partidos históricos dejaron desde aquel momento en manos de la Alianza y como patrimonio de ella, sus nombres históricos al igual que sus símbolos, personalidad, derechos y prerrogativas;

"Por tanto, resuélvese por los concurrentes a este acto, que en su opinión la llamada Junta Central carece ya de autoridad para intervenir en los asuntos que se debaten, y que corresponden única y exclusivamente a la Alianza."

Los señores Arsenio Martínez, Genaro Cautiño y Leopoldo Figueroa manifestaron que hacían suya la explicación del voto negativo que antecede.

La asamblea general fué en efecto convocada, citándose, según se dice, a los miembros de la Junta Central y comités locales que habían sido elegidos en 1922 por un término de cuatro años y que quedaron, según se sostiene por los peticionarios, en receso a partir del pacto de 1924, y fué celebrada en el teatro de San Juan en los días 24 al 26 de agosto de 1929. El acta comprende desde la página 140 a la 189 del libro. En ella se aprobó una resolución, propuesta por su Presidente, Sr. Barceló, cuyos particulares 1, 7 y 9 dicen:

"PRIMERO:—Dar por terminada, como por la presente se dispone que termine y cese, la coalición política llevada a cabo entre el partido 'Unión de Puerto Rico' y el 'Partido Republicano Puertorriqueño', por acuerdo de sus asambleas soberanas de San Germán y Mayagüez, respectivamente, celebradas el día cuatro de mayo de mil novecientos veinte y cuatro.

"SÉPTIMO:—Facultar y ordenar, como por la presente se faculta y ordena, a la Junta Central de la 'Unión de Puerto Rico', para que notifique al Secretario Ejecutivo de Puerto Rico, con copia certificada de la misma, la presente resolución, para que sus determinaciones tengan efecto a todo lo concerniente a los fines electorales;

quedando el partido 'Unión de Puerto Rico' con el carácter de partido principal e independiente que tiene en la actualidad.

"Noveno:—La 'Unión de Puerto Rico' finalmente declara que todo Unionista, miembro del Directorio, miembro de algún Comité Local, de la 'Alianza', o cualquier otro Unionista que, con representación o sin ella, concurra a la Asamblea proyectada de la 'Alianza', se considerará que concurrirá a la misma en su carácter particular o privado, pero no como Unionista; y en su consecuencia, cualquier acuerdo que en dicha Asamblea se adopte no tendrá autoridad ni fuerza legal o moral alguna para ser tenido en cuenta siquiera por la 'Unión de Puerto Rico'."

Después fué convocada y celebrada otra asamblea general extraordinaria en la que fueron designados los peticionarios como candidatos. La designación fué comunicada al Secretario Ejecutivo y éste solicitó la opinión legal del Attorney General. Siguiéndola, se negó a inscribir las candidaturas, constituyendo el motivo fundamental de la negativa la no existencia del partido "Unión de Puerto Rico" como entidad independiente, a virtud de su fusión con el Republicano Puertorriqueño para constituir el partido de la "Alianza Puertorriqueña", tal como dejamos expresado.

Para completar la narración de los hechos, en relación con la actitud asumida por el Secretario Ejecutivo demandado, debe consignarse que la "Alianza Puertorriqueña" comunicó al dicho Secretario los siguientes acuerdos adoptados en asamblea general ordinaria celebrada en Mayagüez los días 31 de agosto y 1 de septiembre de 1929. Dicen:

"Yo, Juan Valldejuli Rodríguez, Secretario de la Asamblea Soberana de la Alianza Puertorriqueña celebrada en la ciudad de Mayagüez los días 31 de agosto y 1 de septiembre de 1929, certifico que en dicha Asamblea fué nominado presidente del Partido Alianza Puertorriqueña el Hon. Rafael Cuevas Zequeira.

"Certifico además que en dicha Asamblea Soberana aquí mencionada fueron nominados Presidentes Honorarios de la Alianza Puertorriqueña las siguientes personas:

"1.—Hon. Eduardo Giorgetti,

"2.—Hon. Córdova Dávila,

"3.—Hon. José Tous Soto,

"4.—Doña Milagros Benet Mewton.

"Certifico además como Secretario del Comité Insular de la Alianza Puertorriqueña que este organismo se reunió, previa convocatoria al efecto hecha por el Hon. Rafael Cuevas Zequeira, Presidente de la Colectividad, en 5 de septiembre de 1929, en el Capitolio de Puerto Rico procediéndose a elegir y fueron electos dos Vice-Presidentes de la Alianza Puertorriqueña recayendo la nominación en los Honorables Genaro Cautiño y Francisco Parra Capó."

"Yo, Juan Valldejuli Rodríguez, Secretario. . . certifico:

"Que en dicha magna asamblea se aprobó la siguiente resolución:

"RESUÉLVASE, por la Asamblea Soberana de la Alianza Puertorriqueña de los partidos Unión de Puerto Rico y Republicano Puertorriqueño:

"1.—Ratificar, una vez más, los acuerdos y resoluciones que dieron vida a la Alianza Puertorriqueña, confirmados por las actuaciones de su Asamblea General de 1928; reconocida y consagrada dicha Alianza como un solo Partido por la Ley y la voluntad expresa del electorado aliancista puertorriqueño, en las últimas elecciones de 1928;

"2.—Que la Alianza Puertorriqueña en sus funciones internas no reconocerá otros organismos que los por ella autorizados y creados, a cuyos acuerdos y reglamentos deberán todos los Aliancistas acatamiento y obediencia.

"Certifico además que en la mencionada asamblea de la Alianza Puertorriqueña celebrada en la ciudad de Mayagüez los días 31 de agosto y 1 de septiembre de 1929 se aprobó la siguiente resolución:

"RESUÉLVASE, por la Asamblea Soberana de la Alianza Puertorriqueña de los partidos Unión de Puerto Rico y Republicano Puertorriqueño:

"1.—Que el Comité Central de esta Colectividad nombrado 'Directorio de la Alianza Puertorriqueña' sea conocido de ahora en adelante con el nombre de 'Comité Insular de la Alianza Puertorriqueña'.

"2.—Que este Comité así denominado será el sucesor del antiguo 'Directorio de la Alianza Puertorriqueña', pudiendo ejercer en tal concepto todas las facultades de dicho Directorio en la forma que prescribe el reglamento de la colectividad.

"Certifico además como Secretario del Comité Insular de la Alianza Puertorriqueña:—

"Que el Comité Insular de la Alianza Puertorriqueña previa convocatoria del presidente de la Colectividad, Hon. Rafael Cuevas Zequeira, se reunió en el Capitolio de Puerto Rico con fecha 5 de septiembre de 1929, asistiendo 34 miembros entre propietarios y suplen-

tes de dicho organismo, constituyendo *quorum* y en la cual reunión se aprobó la resolución siguiente:

"Que se notifique al Secretario Ejecutivo de Puerto Rico que la Alianza de los Partidos Unión de Puerto Rico y Republicano Puertorriqueño, en su asamblea soberana celebrada en 31 de agosto y 1 de septiembre de 1929 en la ciudad de Mayagüez, acordó ratificar nuevamente la Alianza de los Partidos Unión de Puerto Rico y Republicano Puertorriqueño, a los efectos del artículo 42, párrafo 2 de la Ley número 1, para enmendar las secciones 40 y 42 de la Ley de Inscripciones y Elecciones, aprobada en junio 25 de 1919, según ha sido enmendada y conocida, por disposiciones de la misma Ley como 'Ley Electoral de Inscripciones' de mayo 7 de 1927 y se le manifieste además a dicho Secretario Ejecutivo de Puerto Rico que en consonancia con dicho acuerdo la Alianza de los Partidos Unión de Puerto Rico y Republicano Puertorriqueño, sigue reclamando para sí y usando su emblema y nombre de la Alianza de los Partidos Unión de Puerto Rico y Partido Republicano Puertorriqueño con que fué a las urnas en las últimas elecciones generales y según aparecen registrados en la Secretaría Ejecutiva de Puerto Rico."

También recibió el Secretario Ejecutivo una comunicación de M. Díaz García, como Presidente de la Alianza Puertorriqueña, oponiéndose a la inscripción en la Secretaría del nombre "Unión de Puerto Rico", por considerarla lesiva a los intereses de la "Alianza" a quien correspondía exclusivamente dicho nombre.

¿Cómo es posible, a virtud de esos hechos y la ley, llegar a otra conclusión que no sea a la que llegara el Attorney General de Puerto Rico al resolver la consulta que le hiciera el Secretario Ejecutivo y al aconsejarle que denegara la inscripción solicitada por los peticionarios?

Sostienen éstos en su alegato como cuestiones a debatir:

"1.—Que un partido político, como cualquiera otra asociación de las que no tienen un objeto pecuniario, es una asociación voluntaria de ciudadanos capacitados como electores, reconocida como una entidad jurídica con personalidad suficiente para demostrar su existencia legal y dictar reglas para su propia conservación mientras subsista y no se disuelva voluntariamente; pero distinta en su organización interna a la de una Corporación o Sociedad.

"2.—Por razón de su naturaleza jurídica, dos partidos políticos

podrán constituir una sociedad, alianza o coalición de ellos; pero nunca podrán consolidarse o refundirse (*merge*) en uno solo, sin antes disolverse voluntariamente.

"3.—Cualquier sociedad de asociaciones, constituída sin término fijo, puede ser disuelta por la sola voluntad de una cualquiera de las asociaciones integrantes de la sociedad, alianza o coalición en cualquier tiempo, siempre que notifique al otro asociado o asociación la disolución del pacto o contrato social.

"4.—El último '*Disponiéndose*' de la sección 42 de la Ley Electoral, según quedó enmendado por la Ley No. 1 de 7 de mayo del 1927, es gramaticalmente susceptible de interpretarse de acuerdo con el espíritu de la Constitución Americana y de nuestra Carta Orgánica.

"5.—Si la citada sección 42 en relación con la sección 40 de la Ley Electoral, según quedó enmendada en el año 1927, no pudiera interpretarse conforme a nuestra teoría, cualquier otra interpretación resultaría anticonstitucional por los cuatro motivos alegados en el párrafo 8 de nuestra petición de *mandamus*.

"6.—Si los partidos constituyentes de dicha alianza no se consolidaron y ésta fué disuelta por la voluntad de uno de los asociados o coaligados, tales partidos recobraron su personalidad, nombre e insignia y deben ser restituídos a su estado anterior, para lo cual el Secretario Ejecutivo deberá asignar al partido Unión de Puerto Rico el número de votos que le corresponda en las últimas elecciones del 1928, adoptando cualquiera regla que él crea más razonable, justa o equitativa.

"7.—No tratándose en este caso de dos facciones o disidencias de un mismo partido cuyas controversias pudieran resolverse por un Comité Central, sino de dos partidos independientes que reclaman el mismo nombre, insignia y la prerrogativa de partido principal, constituído uno hace 27 años y el otro, en el mes de septiembre de 1929, procede el recurso de *mandamus* para obligar al Secretario Ejecutivo a inscribir las candidaturas del partido que tenga derecho a usar el nombre e insignias de la Unión de Puerto Rico."

Sigue después una argumentación sobre esas cuestiones reveladora de un gran esfuerzo mental, de amplios conocimientos y recursos jurídicos, de habilidad extraordinaria, pero que se estrella en la roca de los hechos consumados, de la ley aplicable, de la inevitable consecuencia de los actos propios.

El pacto de 1924 fué válido, de acuerdo con la ley y los precedentes. Los organismos directores de los partidos políticos, tenían autoridad para actuar como entonces actuaron. Realizada la "Alianza", el electorado siguió a los líderes, y la "Alianza" quedó representada en la Legislatura por una mayoría que le daba el pleno control de la misma. ¿Qué necesidad había de variar la ley, si se quería conservar la coalición y a la vez la personalidad separada de los partidos que la formaban? Los motivos que se han indicado para el cambio por los peticionarios, no resisten a la prueba de un juicio sereno sobre el particular. Las palabras y el propósito de la ley tal como quedó enmendada, son claros. Las secciones 40 y 42 y las 14 y 36 que no fueron enmendadas, están estrechamente entrelazadas. Son preceptos *in pari materia.*

Por la sección 40 se prescribió que ninguna persona podría ser candidato para un mismo cargo en dos o más candidaturas distintas y por la 42 se dispuso que los partidos que en las elecciones anteriores fueron a las urnas aliados o coaligados, inscribiendo candidaturas separadas en las cuales figuraban en todo o en parte los mismos candidatos para iguales cargos, podrían inscribir en la Secretaría Ejecutiva de Puerto Rico, a petición del organismo central directivo de dicha alianza o coalición, un nombre general para dicha alianza o coalición y una insignia que contuviera las insignias de cada uno de los partidos aliados y coaligados, inscribiéndose debajo de la misma una sola candidatura, y dispuso además que la alianza o coalición que así concurriera a las urnas, sería considerada *como un solo partido,* con las mismas prerrogativas, derechos y deberes, que de acuerdo con la ley, tenían los partidos que la integraran, siendo considerada como partido principal u organizado, de acuerdo con el número de votos que obtuviera en la elección.

Se ha argumentado extensamente por los peticionarios en el sentido de que el verbo "considerar" usado por el Legislador en la sección 42 no puede tener el alcance de "convertir" en un solo partido a los partidos coaligados que a

sus preceptos se acojan. También se ha argumentado extensamente por el Fiscal General en el sentido de que lo tiene. A nuestro juicio la intención de la Legislatura es evidente y las palabras de la ley dicen lo que el Legislador quiso decir. "Hasta ahora se trataba de partidos aliados o coaligados. Desde ahora en adelante si dichos partidos adoptan un nombre general y debajo de él inscriben una sola candidatura y así acuden a las elecciones, serán considerados como un solo partido, esto es, serán tenidos como, constituirán, quedarán convertidos en un solo partido, con los mismos derechos y deberes de los partidos que integren la alianza o coalición." Si examinamos, por ejemplo, la sección 14 de la propia Ley Electoral, se verá que desde 1919 el Legislador usó igual verbo y forma, y volvió a usarlos al enmendar la sección en 1924, para prescribir cuáles son los partidos organizados en Puerto Rico. Y así dijo en 1919: "Cualquier organización política que haya depositado el veinte por ciento de la totalidad de los votos de la Isla para Comisionado a Washington en la elección anterior, será considerada como partido organizado. . ." Y dijo en 1924: "y cualquier partido político que haya adquirido la categoría de partido principal, partido de la mayoría o partido organizado, será considerado y tratado como tal. . ." Y es bien claro que ello quiere decir que tales partidos al ser considerados como tales, lo son. El legislador reconoce que tienen la condición de tales, que son tales partidos organizados.

Por la sección 36 se prescribe la forma cómo *los partidos políticos,* únicamente los partidos políticos celebran sus convenciones y certifican sus candidaturas al Secretario Ejecutivo de la Isla.

Se ha insistido en que al pacto de 1924 no se fijó término de duración. No se le fijó expresamente, pero dada la naturaleza especial y los fines y propósitos de los partidos políticos, el término no podía ser otro que el de cuatro años. Para las elecciones que al cabo de esos cuatro años deberían celebrarse de conformidad con la Ley Orgánica, era necesario

ratificar expresa o implícitamente el pacto o tomar otro acuerdo. Y los legisladores de la "Alianza" prepararon el camino para la adopción de ese otro acuerdo, enmendando la ley debidamente, y su organismo director a la ley enmendada se acogió por completo. Lo hizo a sabiendas, dándose cuenta de que al hacerlo sería considerada la "Alianza" como un solo partido, con todas las consecuencias inherentes a tal consideración. Y decimos a sabiendas porque no sólo las palabras de la ley no admiten otro significado, si que además porque así se expresó invariablemente en unos ciento veinte y cinco certificados de convención por las dos figuras más conspicuas de la "Alianza" procedentes del campo de la "Unión"; Antonio R. Barceló y Félix Córdova Dávila. No fué sólo el Secretario, fueron los señores Barceló y Córdova Dávila como Presidentes de las convenciones "celebradas por el partido Alianza Puertorriqueña", los que así lo aseguraron en documentos oficiales. Y no sólo los Directores demostraron tal entendimiento. Cuando se enviaron documentos en relación con las candidaturas para las elecciones de 1928, procedentes directamente de los municipios, en ellos, como en el caso de Yauco que oportunamente transcribimos, se habla expresamente del "Partido Alianza Puertorriqueña". Las convenciones, como se ha dicho, las celebran únicamente los partidos políticos según la sección 36 de la ley, y al designar "La Alianza" sus candidatos por convención, actuó en armonía con sus expresos propósitos de convertirse en un solo partido.

Pero hay más. La Resolución por virtud de la cual el Comité Directivo de la "Alianza" decidió acogerse a la ley enmendada por sus legisladores, dispuso que se solicitara del Secretario Ejecutivo que se inscribiera la conjunción de los partidos "Unión de Puerto Rico" y "Republicano Puertorriqueño" bajo el nombre común de "Alianza Puertorriqueña", para figurar en el ticket electoral como partido político, ordenándose que dicha resolución se comunicara al Gobernador de la Isla, al Secretario Ejecutivo, a la Junta Insular de Elecciones, a los Comités Locales de la Alianza y

al público en general.   Y no sólo se adoptó la resolución por
el Comité Directivo, si que se ratificó en una Asamblea de la
"Alianza" celebrada en el Teatro Municipal de San Juan el
26 de agosto de 1928, en cuya ratificación se dice de modo expreso, en términos inequívocos, *"quedando de este modo
como patrimonio de 'La Alianza' los nombres históricos de
los dos partidos aliados, al igual que sus símbolos, personalidad, derechos y prerrogativas."*

Y así quedó finalmente consumado cuando de conformidad
con el acuerdo del Comité ratificado por la Asamblea, la
"Alianza" fué a las urnas de tal modo.

■■■ Se dice ahora que si se interpretara del modo que
hemos interpretado la sección 42 de la Ley Electoral, deberíamos decidir que era contraria a la Constitución.   No fué la
*Alianza* la que atacó en 1928 la constitucionalidad de la Ley
Electoral.   Fué su adversario el "Partido Constitucional Histórico".   Y con motivo del recurso legal que estableciera,
quedó expuesto el criterio de esta Corte Suprema a que antes nos referimos del siguiente modo:

"Entramos a discutir la cuestión del nombre.   En 1924, el antiguo Partido Republicano se dividió en dos sectores.   Uno de ellos retuvo la maquinaria del partido, y continuó designándose con el nombre de Partido Republicano.   El otro sector celebró una convención
separada y llegó a ser conocido con el nombre de 'Partido Constitucional Histórico', que es el verdadero peticionario en este caso.   El
partido desea cambiar su nombre por el de 'Partido Republicano
Puro'.   El demandado, en su carácter de Secretario Ejecutivo de
Puerto Rico, al igual que el interventor, .el Partido Republicano Puertorriqueño, alegan que dicho Partido Republicano conserva aún el
nombre y el emblema del partido.   El peticionario alega que el Partido Republicano tiene convenida una fusión con el Partido Unionista,
y que, por tanto, dicho Partido Republicano ha perdido su personalidad.   Este, sin embargo, sostiene y demuestra que esta fusión no
tendrá efecto legal hasta el día en que se celebren las elecciones.   La
sección 42 de la Ley Electoral, según quedó enmendada el 7 de mayo
de 1927, lee así:

" 'Ningún partido político adoptará como nombre o. emblema un
nombre o .emblema que se hubiere usado o adoptado previamente

por otro partido político, en todo o en parte, si ese otro partido todavía reclama y usa dicho nombre 'o emblema. . .''

''Estamos convencidos de que la Legislatura tenía derecho a prohibir el uso de un nombre que otro partido utiliza parcial o totalmente y que tal prohibición se hará extensiva a un nombre que el otro partido se proponga usar en las elecciones venideras. No importa que el día de las elecciones o posteriormente el otro partido se proponga hacer una fusión con un tercer partido bajo un nombre distinto. El llamado Partido Republicano tiene una existencia legal independiente hasta el mismo día de las elecciones.''

''El llamado Partido Republicano tiene una existencia legal independiente hasta el mismo día de las elecciones'', dijimos entonces, el 25 de junio de 1928. El llamado ''Partido Unión de Puerto Rico'' tuvo una existencia legal independiente hasta el mismo día de las elecciones de 1928, decimos ahora, aplicando igual criterio, ya que la fusión se acordó de conformidad con la ley y fué sancionada por el electorado.

''Estamos convencidos de que la Legislatura tenía derecho a prohibir el uso de un nombre que otro partido utiliza parcial o totalmente y que tal prohibición se hará extensiva a un nombre que el otro partido se proponga usar en las elecciones venideras'', dijimos también entonces, y aplicando lo dicho a este caso expresamos ahora que siendo el nombre ''Unión de Puerto Rico'' patrimonio del partido ''Alianza Puertorriqueña de los Partidos Unión de Puerto Rico y Republicano Puertorriqueño'', que lo reclama para usarlo en las próximas elecciones, no puede dicho nombre ''Unión de Puerto Rico'' ser usado por ningún otro partido o agrupación, de acuerdo con una ley para dictar la cual tenía plenas facultades la Legislatura.

En el caso de *Riter* v. *Douglass,* 109 Pac. 440, 447, que es un caso electoral, se dijo:

''. . . El Juez Cooley en su gran obra sobre Limitaciones Constitucionales dice: 'La regla de derecho sobre la materia parece ser que excepto cuando la Constitución ha fijado límites al poder legislativo, éste debe ser considerado como prácticamente absoluto,

opere o no de acuerdo con el derecho natural en cualquier caso determinado. Las cortes no son los tutores de los derechos de los habitantes del estado, excepto en tanto tales derechos estén garantizados por alguna disposición constitucional que caiga dentro del conocimiento judicial. La protección contra legislación poco sabia u opresiva dentro de los límites constitucionales se logra apelando a la justicia y patriotismo de los representantes del pueblo. Si esto fracasa, el pueblo en su capacidad soberana puede corregir el mal; pero las cortes no pueden asumir sus derechos. El poder judicial solamente puede impedir que se ponga en vigor un estatuto cuando está en conflicto con la Constitución. . . Cualquier actuación judicial que no sobrepase los límites de los poderes otorgados a otros departamentos gubernamentales, siendo *prima facie* válida, debe hacerse cumplir, a menos que puedan señalárse en la Constitución algunas restricciones a la autoridad legislativa y que se demuestre que el caso cae dentro de tales limitaciones.'' Cooley's Constitutional Limitations (7th Ed.) 236–237.. La Corte Suprema de Pennsylvania tersamente expresa la regla así: 'Nada que no sea una clara infracción de la Constitución—una clara usurpación de poder que ha sido prohibido—justificará al poder judicial que declare una ley del departamento legislativo inconstitucional y nula.' *Pennsylvania Railroad Co.* v. *Ribelt,* 66 Pa. 169 (5 Am. Rep. 360). Nuestra propia Corte Suprema, al interpretar el poder legislativo del estado, resolvió lo siguiente: 'Que la Legislatura tiene el poder de aprobar cualquier ley que no esté prohibida por nuestra Constitución.' *State* v. *Arrington,* 18 Nev. 412, 4 Pac. 735. Será innecesario consumir cualquier tiempo considerando todo lo que se ha dicho en las argumentaciones y en cualquiera otra forma, respecto a la sabiduría, política o conveniencia de la ley en controversia, a no ser para manifestar que esta corte, de conformidad con el derecho incontrovertible, ha resuelto que estos extremos deben ser determinados solamente por el poder judicial, y que por esta razón ninguna actuación legislativa está sujeta a derogación judicial. *Ex parte Boyce,* 27 Nev. 299, 75 Pac. 1, 65 L.R.A. 47; *Ex parte Kair,* 28 Nev. 132–149, 80 Pac. 463, 113 Am. St. Rep. 817; Id., 28 Nev. 425–439, 82 Pac. 453.''

Los poderes de la Legislatura de Puerto Rico surgen de nuestra Carta Orgánica. Ninguna de las prescripciones y limitaciones que dicha carta contiene le prohibe actuar en la forma en que lo hizo. La materia sobre la cual legisló está

dentro de su jurisdicción. El derecho fundamental del ciu-
dadano al voto no se destruyó ni obstaculizó. Tampoco se
destruyó ni obstaculizó el derecho de los votantes a formar
agrupaciones o partidos. Se reguló. El Legislador por la
sección 42 de la Ley Electoral, no creó ningún nuevo partido.
Se limitó a fijar la regla a virtud de la cual podía crearse.

Conocemos bien el principio de que si una ley admite dos
interpretaciones, una de ellas que la hace constitucional y
otra que la coloca fuera de las limitaciones de la constitu-
ción, debe aceptarse por las cortes la interpretación primera,
pero estimamos que tal principio no es de aplicación aquí,
porque consideramos que la ley tal como ha sido interpre-
tada y fué bien entendida por los partidos "Unión de Puerto
Rico" y "Republicano Puertorriqueño" al acogerse volun-
tariamente a ella, no es anticonstitucional. Si acaso hubiere
podido atacarse por inconstitucional la ley, aunque no debe
entenderse que resolvemos tal cosa, lo hubiera sido en tanto
en cuanto prohibía que figuraran iguales candidatos bajo di-
ferentes candidaturas.

██ ██ Se insiste en sostener en que para que pudiera veri-
ficarse la fusión de dos partidos en uno, era necesario que
dichos partidos se hubieran previamente disuelto. Estamos
conformes. En lo que no estamos es en que era necesario
convocar a los antiguos organismos para que éstos acorda-
ran la disolución. La disolución quedó de hecho acordada
por la actuación de los organismos directivos y fué sancio-
nada por el cuerpo electoral.

Por el pacto se crearon nuevos comités directores, insular
o central y locales, que asumieron la plena dirección de am-
bos partidos. Conocemos cómo fueron desenvolviéndose los
acontecimientos. Parece que la alianza en la práctica re-
sultó tan completa y eficiente, que la fusión fué acordada
por los jefes reconocidos de uno y otro partido en el seno
de la misma. Pública fué la enmienda de la ley electoral,
pública la resolución acogiéndose a ella, público el traspaso
al patrimonio de la "Alianza" de los nombres, la personali-

dad, las insignias y las prerrogativas de los partidos que pactaron en 1924. Faltaba únicamente la actuación del electorado, que es el supremo juez, y el electorado habló en las elecciones de 1928 aprobando la actuación de los jefes.

Que se podía actuar así, se desprende, si se penetra bien en el fondo de ello, de todos los casos citados en los alegatos definiendo lo que son los partidos políticos, cómo se constituyen y funcionan, y cuáles son sus propósitos y facultades. Citaremos sólo dos.

En *Davis* v. *Hambrick,* 58 S. W. 779, 780, se dijo:

"Los partidos políticos son asociaciones voluntarias para fines políticos. Son regidos por sus propios usos y establecen sus propias reglas. Los miembros de tales partidos pueden constituirlos, reorganizarlos, y disolverlos a su voluntad. Los electores que constituyen tal partido son, en verdad, el único cuerpo que puede finalmente determinar entre facciones u organizaciones rivales."

Y en *Morrow* v. *Wipf,* 115 N. W. 1121, 1126 y 1127, se expresa:

"Los partidos políticos no son creaciones de la ley. Existen independientemente de los estatutos; y tienen poder inherente para reglamentar sus propios asuntos, sujetos solamente a aquellas restricciones legislativas que han sido legalmente enactadas.

"*     *     *     *     *     *     *

"Los partidos políticos resultan de la asociación voluntaria de los electores. No existen por ministerio de ley; y poseen plenos poderes respecto a sus propios asuntos, en ausencia de reglamentación legislativa."

Las desavenencias como dejamos establecido surgieron después de las elecciones de 1928, convertida ya la "Alianza" en un partido organizado, y lo fueron, como también dijimos, no entre los grupos de distinto origen sino entre líderes de ambas procedencias ya entrelazados y confundidos en el seno de la colectividad. Siendo ello así es evidente que su solución correspondía a los organismos directores, Comité Directivo y Asambleas, de la propia "Alianza Puertorriqueña", y mientras a ellos no se sometiera su investigación y solución,

ni el Secretario Ejecutivo podía actuar ni las Cortes de Justicia intervenir, de acuerdo con los precedentes y la jurisprudencia aplicables. Creemos que esto es tan claro que hasta los mismos peticionarios lo reconocen en cierto modo en su séptima proposición. Abundante jurisprudencia sobre el particular puede encontrarse en el alegato del *amicus curiae.*

Durante todo el tiempo que hemos dedicado al estudio y resolución de este caso, la única vacilación que hemos tenido es la de si a virtud de nuestra actuación impediríamos que libremente volvieran a agruparse bajo su vieja bandera los que con ella fueron tantas veces a la lucha, pero la conciencia reacciona al darse cuenta de que no es sólo el caso de los peticionarios el que está envuelto, sino el de sus compañeros de pacto y fusión que no han sido plenamente oídos, pero que han avisado que se mantienen firmes en sus compromisos y actuaciones. El reconocimiento de la personalidad que reclaman para sí los peticionarios, implica la destrucción de la personalidad creada al amparo de la ley por la libre voluntad de ellos mismos y de sus amigos, correligionarios y asociados de otro tiempo. Son intereses encontrados los que están envueltos y lo más justo es aplicar la ley tal como fué enactada, entendida y usada, y dejar que cada cual se avenga a las consecuencias de sus propios actos.

El presente no es en verdad un caso propio para expedir un auto de *mandamus.* Bajo las circunstancias, el verdadero deber ministerial que tenía el Secretario Ejecutivo, fué por él cumplido al negarse como se negó a inscribir las nominaciones de los peticionarios como candidatos del partido "Unión de Puerto Rico".

Después de todo hay que reconocer que si bien el nombre de una colectividad política tiene gran importancia afectiva y puede influir notablemente en el éxito de unas elecciones, son los electores los que con sus votos tienen el control definitivo de ellas. Si es cierto que los peticionarios conservan toda la fuerza del viejo partido a que pertenecieron y que

la "Alianza" no cuenta con el apoyo del cuerpo electoral, dicho cuerpo tendrá la oportunidad de expresarse por sí mismo en las elecciones de 1932, bajo cualquier nombre que los peticionarios escojan para concurrir a ellas de acuerdo con la ley.

*Debe negarse la solicitud de mandamus.*

### VOTO DISIDENTE DEL JUEZ ASOCIADO SEÑOR ALDREY

Se trata en este caso de una solicitud de *mandamus* presentada en este Tribunal en la que se interesa que ordenemos al Secretario Ejecutivo de Puerto Rico, Sr. Saldaña, que registre e inscriba la candidatura para ciertos cargos que ha de ser sometida a elección popular en 1932, certificada por los funcionarios que presidieron la asamblea del partido Unión de Puerto Rico celebrada el 21 de octubre de 1930; para que dicho Secretario certifique a la Junta Insular de Elecciones el hecho de haber sido nominados los peticionarios, a fin de que esas nominaciones sean impresas en la papeleta oficial de las elecciones que han de celebrarse en 1932; y para que se notifique a dicha Junta que el partido Unión de Puerto Rico es el partido de la mayoría o partido principal con derecho a designar inspectores y secretarios en las juntas de inscripciones y colegios electorales el día de las elecciones.

En esa solicitud se alega que el Secretario Ejecutivo de Puerto Rico se ha negado a esas peticiones, y en la contestación de dicho funcionario al auto que hemos expedido para mostrar causa por las cuales no debemos expedir el auto interesado alega como único motivo de oposición a lo que se interesa por los peticionarios que al verificarse las elecciones generales de 1928 quedaron los partidos Unión de Puerto Rico y Republicano Puertorriqueño fusionados o convertidos en un solo partido político con el nombre de Alianza Puertorriqueña, que figura ahora como partido de la mayoría.

Los hechos que resultan de estos autos son los siguientes: En el año 1904 se organizó en esta Isla el partido político

Unión de Puerto Rico, cuyos candidatos en las elecciones generales de ese año obtuvieron la mayoría de votos. En las elecciones generales de 1906, 1908, 1910, 1912, 1914, 1917 y 1920 también obtuvo ese partido la mayoría de los sufragios. Los votos obtenidos por el partido Unión de Puerto Rico en las elecciones de 1920 sumaron 126,446, y el Partido Republicano Puertorriqueño que le siguió en número de votos obtuvo 63,845, y como los otros partidos sólo obtuvieron 11,380 votos resultaron aquellos dos ser los dos partidos principales.

Esos dos partidos políticos, Unión de Puerto Rico y Republicano Puertorriqueño, celebraron asambleas en mayo de 1924, el primero en la ciudad de San Germán y el segundo en la de Mayagüez, en las que acordaron lo siguiente, que copiamos de la solicitud de *mandamus* en este caso, aceptado en este particular por el Secretario Ejecutivo y confirmado por el acta de la asamblea de San Germán a que hemos hecho referencia:

" (*a*) Constituir con el Partido Republicano Puertorriqueño, una coalición política que se denominará Alianza Puertorriqueña.

" (*b*) La Alianza Puertorriqueña asumirá y ejercitará todos los poderes y prerrogativas que competen a los dos partidos históricos de Puerto Rico, denominados partidos Unión de Puerto Rico y Republicano Puertorriqueño.

" (*c*) La Alianza Puertorriqueña encaminará todos sus esfuerzos a la consagración del pleno gobierno propio para alcanzar la soberanía del pueblo de Puerto Rico dentro de la soberanía de los Estados Unidos.

"La Junta Directiva de la coalición determinará la forma de llevar al ticket electoral los candidatos de la misma, entendiéndose que los partidos que así se coaligan, habrán de conservar su personalidad, nombre e insignias respectivas.

"El gobierno y dirección de la coalición, residirá en un comité directivo compuesto de 15 personas propietarias y 15 suplentes, elegidas de la manera siguiente: 7 propietarios y 7 suplentes designados por la asamblea del partido Unión de Puerto Rico, de una lista de 21 suministrada por la asamblea del Partido Republicano Puertorriqueño y 7 propietarios y 7 suplentes designados por la

asamblea del Partido Republicano Puertorriqueño de una lista de 21 suministrada por la asamblea del Partido Unión de Puerto Rico y un propietario y un suplente que serán designados unánimemente por los 14 miembros propietarios. El comité directivo elegirá de su seno un directorio ejecutivo compuesto de 3 miembros. El directorio ejecutivo tendrá los poderes que determine el comité directivo y residirá y tendrá su asiento en la ciudad de San Juan. Una vez que las asambleas de los partidos respectivos aprueben la plataforma de la coalición, las bases de ésta y los procedimientos a seguir, quedarán en receso por el tiempo que dure la coalición, así como los demás organismos de los partidos coaligados, quedando en suspenso sus funciones. El quorum para celebrar la sesión del comité directivo constará de 10 miembros en funciones legales y ningún acuerdo tendrá efectividad a no ser que fuese sancionado, al menos, por 9 miembros en sesión para la cual hayan sido citados los miembros del comité directivo.

"Si a pesar de esta convocatoria no concurriere un número bastante de miembros del comité directivo para formar dicho quorum, se procederá a nueva y segunda convocatoria a todos ellos, y, una vez convocados, el quorum para celebrar sesión constará de 8 miembros solamente.

"El presidente del comité directivo será el presidente del comité ejecutivo, pero en ningún caso este comité estará formado en su totalidad de miembros pertenecientes a uno solo de los partidos que formen la alianza.

"Los comités locales de la coalición se compondrán de 7 miembros designados en la forma siguiente: 3 unionistas, 3 republicanos y el séptimo designado por el comité directivo. El comité directivo elegirá los miembros de los comités locales de la coalición dentro de las personas que formen, en los respectivos municipios, el organismo local de dicho partido, siempre que puedan obtenerse personas afectas a la coalición; en otro caso podrá ser la elección, en todo o en parte, fuera de los comités.

"Los miembros de cada partido en dichos comités, asumirán las funciones correspondientes al partido que representan a los efectos de las leyes electorales y municipales."

En noviembre del año 1924 hubo elecciones generales en esta Isla en las que los dos partidos coaligados mencionados figuraron en columnas separadas en la papeleta electoral oficial, pero teniendo cada uno de ellos los mismos candidatos

que el otro para los cargos objeto de la elección. En ella votaron por el partido Unión de Puerto Rico 132,755 personas y por el Partido Republicano Puertorriqueño 30,286, lo que da una suma de 163,041 votos para los candidatos de la alianza de ambos partidos; resultando que un 81 por ciento de ese total fueron votos del partido Unión de Puerto Rico y el resto de 19 por ciento fué de votos del Partido Republicano Puertorriqueño. También resultó que los 132,755 votos del partido Unión de Puerto Rico fueron superiores en 10,749 al total de todos los demás partidos; resultando asimismo que los votos obtenidos por el Partido Republicano Puertorriqueño llegaron escasamente a una cuarta parte de los que obtuvo su coaligado.

En 28 y 31 de agosto y en 5 y 25 de septiembre, 1928, fueron remitidas al Secretario Ejecutivo de Puerto Rico certificaciones de los candidatos para las elecciones generales de noviembre de ese año, casi todas substancialmente iguales aunque con distintos nombres y candidatos propuestos según el cargo. Copiaremos una de ellas que dice así: "Alianza Puertorriqueña—Certificado de Convención.—Los que suscriben, presidente y secretario de la convención celebrada por el partido Alianza Puertorriqueña en San Juan, P. R., CERTIFICAN: Que reunidos previa convocatoria, los miembros que constituyen dicha convención, al objeto de nombrar los candidatos de la Alianza Puertorriqueña para los cargos de Comisionado Residente en los Estados Unidos, Senadores y Representantes *at large* y miembros de la Junta de Revisión e Igualamiento, que deberán figurar en el ticket en las próximas elecciones de noviembre, se llevó a cabo la votación entre los concurrentes, resultando proclamados, después del escrutinio, los señores siguientes:" Siguen los nombres de ciertas personas para determinados cargos y después ese documento termina así: "Y para remitir al Secretario Ejecutivo de Puerto Rico, en cumplimiento de lo que dispone la sección 36 de la Ley Electoral vigente, firmamos la presente en San Juan, Puerto Rico, a 28 de agosto de 1928." Siguen las fir-

mas del presidente y del secretario. Otra de esas certificaciones dice así: "Comité de la Alianza Puertorriqueña, Aguadilla, P. R.—Yo, J. B. García Méndez, secretario del comité local de la Alianza Puertorriqueña en Aguadilla, CERTIFICO: Que en la sesión de este comité celebrada el día 22 de septiembre del año en curso, se designó al Sr. Salvador Badillo Méndez como candidato a la Asamblea Municipal de Aguadilla y como tal ha de figurar en el ticket electoral de la Alianza Puertorriqueña. Y para remitir al Secretario Ejecutivo de Puerto Rico, expido la presente en Aguadilla, Puerto Rico, hoy día 25 de septiembre de 1928. Sigue la firma del secretario del comité local de la Alianza. No transcribimos aquí un certificado de la Asamblea de la Alianza Puertorriqueña celebrada en San Juan el 26 de agosto de 1928 de que se hace mención en la opinión del Hon. Attorney General al Secretario Ejecutivo de Puerto Rico, fechada el 30 de enero de 1931, porque ese documento no aparece completo en esa opinión y porque no fué presentado como prueba por el demandado, Secretario Ejecutivo de Puerto Rico, a pesar de tenerlo en su poder, de modo que la parte contraria pudiera completarlo o hacer las objeciones que tuviera por conveniente, si algunas tenía. En esa opinión, después de dar su parecer sobre algunas cuestiones del caso, se concluye diciendo al Secretario Ejecutivo que niegue la petición para permitir así que los reclamantes que rivalizan en la obtención del nombre "Unión de Puerto Rico" resuelvan su controversia en las cortes que son, en el último análisis, las llamadas a resolver esa cuestión.

En las elecciones generales que tuvieron lugar en 1928 ambos partidos coaligados inscribieron su candidatura común en una sola columna en la siguiente forma: una balanza al fiel con las insignias de ambos partidos y debajo las palabras "Alianza Puertorriqueña de los partidos Unión de Puerto Rico y Republicano Puertorriqueño."

Desde que fué celebrada la alianza o coalición de esos dos partidos en 1924 los cuerpos directivos de cada uno de

ellos quedaron en receso, pero en agosto de 1929 se célebró una asamblea general del partido Unión de Puerto Rico, constituída en la misma forma que la que en 1924 había acordado la mencionada alianza, y tomó el acuerdo de declarar rota y disuelta la alianza que ese partido tenía concertada con el Partido Republicano Puertorriqueño; acuerdo que fué notificado al presidente del Partido Republicano Puertorriqueño y también al Secretario Ejecutivo de Puerto Rico, Sr. Saldaña, quien en 28 de agosto de 1929 contestó al presidente del partido Unión de Puerto Rico que había tomado nota oficial del acuerdo en los archivos de su secretaría, a los efectos que fueren procedentes de acuerdo con la Ley Electoral.

Algún tiempo después, en 11 de septiembre de 1929, el Sr. Valldejuli, como secretario de una asamblea de la Alianza Puertorriqueña y como secretario del comité insular de dicha colectividad, comunicó al Secretario Ejecutivo de Puerto Rico que una asamblea de la Alianza Puertorriqueña de los partidos Unión de Puerto Rico y Republicano Puertorriqueño resolvió ratificar los acuerdos que dieron vida a la Alianza Puertorriqueña, confirmados por las actuaciones de su asamblea general de 1928; reconocida y consagrada dicha alianza como un solo partido por la ley y por el electorado aliancista en las elecciones de 1928; y que también resolvió que el comité central de la colectividad nombrado Directorio de la Alianza Puertorriqueña sea reconocido en adelante con el nombre de "Comité Insular de la Alianza Puertorriqueña", con todas las facultades de aquél. Asimismo comunicó que el comité insular de la Alianza Puertorriqueña se reunió el 5 de septiembre de 1929 asistiendo 34 miembros entre propietarios y suplentes, que constituían *quorum,* y aprobó que se notificara al Secretario Ejecutivo de Puerto Rico que la alianza de los partidos Unión de Puerto Rico y Republicano Puertorriqueño reclama para sí el nombre con que fué a las urnas en las últimas elecciones, según aparece registrada en la Secretaría Ejecutiva de Puerto Rico. En otra comunicación de la misma persona y actuando en la misma representación que

antes lo hizo, comunicó al Secretario Ejecutivo de Puerto Rico en 13 de septiembre de 1929 que la asamblea a que se refirió nombró un presidente para la Alianza Puertorriqueña, cuatro presidentes honorarios, dos vicepresidentes y dos secretarios. También el Sr. Díaz García como presidente de la Alianza Puertorriqueña comunicó al Secretario Ejecutivo de Puerto Rico en 2 de noviembre de 1929 que el nombre Unión de Puerto Rico pertenece exclusivamente a la Alianza Puertorriqueña, de acuerdo con la ley, y que esa alianza está sancionada por el electorado.

El motivo que tiene el Secretario Ejecutivo de Puerto Rico para oponerse a la petición a que se refiere este procedimiento es que por haber ido el partido Unión de Puerto Rico y el Republicano Puertorriqueño a las elecciones de 1928 poniendo sus candidatos en una sola columna, ambos partidos han dejado de tener existencia separada por haber quedado fusionados o convertidos en un solo partido político llamado Alianza Puertorriqueña.

Debemos hacer constar que la palabra española "fusión" (*merger* en inglés) no tiene el mismo significado en el idioma inglés, en el que significa coalición, según puede verse en el caso de *Nicholls* v. *Barrick*, 27 Colo. 432. Esto no es necesario para la interpretación de la Ley Electoral porque no usa tal palabra, sino para la lectura de las sentencias de los Estados Unidos que tratan esa materia.

De acuerdo con la ley el partido Unión de Puerto Rico por el número de los votos que obtuvo en las elecciones de 1904 se convirtió en partido de la mayoría, cuyo rango conservó durante las elecciones sucesivas y tenía cuando en 1924 celebró la alianza o coalición con el Partido Republicano Puertorriqueño.

La ley vigente cuando tuvieron lugar las elecciones generales de noviembre de 1924 permitía que una persona pudiese figurar como candidato por dos o más partidos políticos, y de acuerdo con ella, celebrada ya la alianza, ambos partidos aliados figuraron en columnas separadas y con sus

correspondientes insignias pero teniendo ambos la misma candidatura. Ley No. 79 de 25 de junio de 1919, conocida como Ley Electoral, sección 40, según había sido enmendada en 18 de junio de 1924.

La ley y sección antes citadas fué enmendada por la No. 1 de 7 de mayo de 1927, página 395 de las de ese año, disponiendo que ninguna persona podrá ser candidato para más de un cargo ni para un mismo cargo en dos o más candidaturas distintas; y también enmendó la sección 42 de la ley anterior en la siguiente manera:

"Sección 42.—El nombre y emblema que usaren para distinguirse en las papeletas electorales cada uno de los partidos políticos principales u organizados, serán los mismos que usaron dichos partidos en las precedentes elecciones, a menos que se notifique un cambio de nombre o emblema al Secretario Ejecutivo de Puerto Rico en o antes del día 20 de septiembre del año de las elecciones en las cuales deberán usarse.

"Ningún partido político adoptará como nombre o emblema un nombre o emblema que se hubiere usado o adoptado previamente por otro partido político, en todo o en parte, si ese otro partido todavía reclama y usa dicho nombre o emblema. Ningún partido político empleará como divisa en las papeletas electorales la bandera o el escudo de armas de los Estados Unidos o de Puerto Rico. El Secretario Ejecutivo de Puerto Rico queda por la presente autorizado para negarse a aceptar y se le ordena que se niegue a aceptar cualquier nombre o emblema de un partido político que fuere presentado para su registro o archivo en su oficina que infrinja las disposiciones de esta sección. Si cualquier partido político dejare de registrar un emblema con el Secretario Ejecutivo de Puerto Rico, en o antes del día 20 de septiembre del año de las elecciones en que hubiere de emplearse, según se requiere por esta Ley, el Secretario Ejecutivo designará un emblema para ese partido, el cual emblema deberá usarse para distinguir a dicho partido en la papeleta oficial.

"Cualquier partido político principal u organizado que quisiese cambiar su nombre o divisa podrá hacerlo mediante una certificación del organismo director central de dicho partido radicada en la Secretaría Ejecutiva, sin que por esto tal partido pierda los derechos y privilegios que la ley le concede como tal partido principal

u organizado; *Disponiéndose,* que los partidos que en las elecciones anteriores fueron a las urnas aliados o coaligados, inscribiendo candidaturas separadas en las cuales figuraban en todo o en parte los mismos candidatos para iguales cargos, podrán inscribir en la Secretaría Ejecutiva de Puerto Rico, a petición del organismo central directivo de dicha alianza o coalición, un nombre general para dicha alianza o coalición, y una insignia que contenga las insignias de cada uno de los partidos aliados o coaligados, y debajo de la misma se inscribirá una sola candidatura de acuerdo con las prescripciones de la sección 40 de la Ley Electoral y de Inscripciones tal y como ha sido enmendada por la presente; *Disponiéndose, además,* que la alianza o coalición que concurra a las urnas bajo un mismo nombre o divisa tal y como se determina en el 'Disponiéndose' anterior, será considerada como un solo partido con las mismas prerrogativas, derechos y deberes, que de acuerdo con la Ley, tienen los partidos que la integran, y en lo sucesivo será considerada como partido principal u organizado, de acuerdo con el número de votos que obtenga en la elección, según se prescribe en esta Ley.''

Esta ley fué presentada en la Asamblea Legislativa en español y en este idioma corrió todos sus trámites.

Por esas enmiendas la alianza de los partidos Unión de Puerto Rico y Republicano Puertorriqueño no pudiendo ocupar columnas separadas con candidatos comunes, como lo hicieron en 1924, tuvieron que figurar sus candidatos en una sola columna bajo el nombre y emblema que hemos dicho antes, de Alianza de los partidos Unión de Puerto Rico y Republicano Puertorriqueño.

Por las enmiendas últimas a las secciones 40 y 42 de la Ley Electoral y por el hecho de haber ido la alianza de esos dos partidos a las elecciones de 1928 en una sola columna de la papeleta electoral con sus candidatos, surge la cuestión fundamental a resolver en este caso, que es la de si en esas elecciones los dos partidos aliados Unión de Puerto Rico y Republicano Puertorriqueño han dejado de tener existencia como tales partidos por haber quedado fusionados o convertidos en un nuevo partido llamado Alianza de los partidos Unión de Puerto Rico y Republicano Puertorriqueño, por disposición de la ley, o si no existe tal fusión ni nuevo par-

tido y que por esto cada uno de ellos conserva su personalidad, insignias y prerrogativas electorales para hacerlos valer en caso de ruptura de tal alianza, la que ha ocurrido en este caso.

No contiene esa ley palabra alguna que diga que los partidos que en las elecciones anteriores fueron a las urnas aliados o coaligados y que en las elecciones de 1928 concurran a ellas bajo un nombre general para dicha alianza o coalición con una insignia que contenga las insignias de cada uno de los partidos aliados o coaligados con una sola candidatura queden fusionados, en el sentido que tiene esa palabra en español, o convertidos en un nuevo partido compuesto o formado por la fusión de ambos partidos en otro nuevo, pues lo que dice la ley es que la alianza o coalición de los partidos que así vayan a las elecciones de 1928 será considerada como un solo partido con las mismas prerrogativas, derechos y deberes que de acuerdo con la ley (cuando fué promulgada) tienen los partidos que la integran y que en lo sucesivo será considerada (tal alianza) como partido principal u organizado, de acuerdo con el número de votos que obtenga en la elección, según se prescribe en la ley. La palabra "como" es un adverbio de comparación según la gramática española. Cuando una cosa se la considera como otra es porque no es la otra, y cuando una alianza de dos o más partidos se la considera como un solo partido es porque no es un solo partido sino que será considerada como si fuera un partido con las prerrogativas, derechos y deberes que tienen los partidos. La frase "será considerada como" no puede confundirse con el concepto "quedará constituída o convertida en". Puede darse a una cosa, a una entidad, o a un derecho la consideración de otra entidad o derecho sin convertirla en esa cosa. Los tribunales no pueden poner en la ley palabras que no tiene, ni substituirlas por otras. *El Pueblo* v. *González,* 20 D.P.R. 591.

Si la Legislatura hubiera querido convertir a los partidos aliados en un solo partido hubiera dicho que después de

las elecciones esa alianza o coalición quedará convertida en un partido, será un partido, o palabras semejantes. Por consiguiente, entendemos que interpretando las palabras de la ley en su más corriente y usual significación y con el uso general y popular de las voces, como dispone el artículo 14 del Código Civil, tenemos que llegar a la conclusión de que la ley no convirtió en un solo partido a los dos partidos políticos cuyos candidatos figuraron en una sola candidatura en la papeleta electoral bajo las insignias de ambos partidos. Por otra parte, sostener que la ley creó un nuevo partido compuesto de los dos aliados por el hecho de haber acudido juntos a la elección en una sola columna de la papeleta electoral, obligados a ello porque la ley no les permitía hacerlo de otra manera, equivale a sostener que la Legislatura puede crear partidos políticos, lo que no es cierto, según reconoce el Hon. Attorney General en este caso; y también porque esa ley trataría de impedir la coalición de partidos que generalmente está admitida.

Para la interpretación de esa ley pueden tenerse también en cuenta otros extremos de la Ley Electoral. Esa ley crea la junta insular permanente de elecciones, cuyas funciones son, entre otras, la inspección y dirección de las elecciones, aprobar reglas y reglamentos para las mismas, para revisar y corregir las listas electorales, cancelar inscripciones de electores juzgando la prueba que para ello se le presente y practicar el escrutinio general de la votación. Tal junta, con funciones tan importantes, está constituída por tres personas, una como presidente, nombrada por el Gobernador con el consejo y consentimiento del Senado, y las otras dos personas representando los dos partidos políticos principales de la Isla. En cada colegio electoral de cada precinto debe haber una junta de colegio compuesta de dos inspectores y de dos secretarios, nombrados por los partidos políticos principales, para presidir las elecciones y hacer el escrutinio de votos. Para las elecciones de 1924 los dos partidos principales eran el partido Unión de Puerto Rico y el Repu-

blicano Puertorriqueño por los votos obtenidos en la elección precedente; y según la ley los otros partidos que hubiesen obtenido cierto tanto por ciento en la elección anterior sólo podían tener en las juntas de colegio un observador pero sin voto.

En vista de esa situación legal, entendemos que lo que quiso la sección 42 de la ley como fué enmendada en 1927 fué evitar que estando coaligados los dos partidos principales tuviese cada uno de ellos puesto en la junta insular de elecciones y en las juntas de colegio, dejando así sin representación a los otros partidos, y que por eso dispuso que los partidos que en las elecciones de 1928 fuesen a las urnas coaligados se les consideraría como un partido, a fin de que como un solo partido tuviese una representación en la Junta Insular y en los colegios electorales; que sería equiparado en cuanto a la Ley de Elecciones a un partido, sin dejar de ser un organismo compuesto de dos entidades; que al actuar conjuntamente y con relación a la ley electoral no tendrían más privilegios y derechos que los que tenga otro partido, pero conservando su estructura de coalición puesto que ninguno de ellos prestó su consentimiento para fusionarse o confundirse con el otro. Además, si la ley hubiera querido que los partidos coaligados quedasen fusionados o convertidos en uno solo después de las elecciones de 1928 no hubiera dicho ''será considerada como un solo partido'' con las mismas prerrogativas, derechos y deberes que de acuerdo con la ley tienen los partidos que la integran. Porque fusionados o desaparecidos los partidos que formaron la alianza, extinguida su vida particular por haberse convertido en un nuevo partido, no podrían continuar con las prerrogativas, derechos y deberes de cada uno de ellos por haber cesado de ser tales partidos. Además, el adverbio ''como'' no está usado impensadamente pues se emplea en cada uno de los dos últimos *disponiéndose* de la ley.

No es objeción a la conclusión a que llegamos decir que los partidos coaligados no estaban obligados a concurrir a

las elecciones con un nombre general y con una sola candidatura, pues a menos que entonces rompieran su alianza la ley no les permitía ir a las urnas en otra forma. Ni tampoco que el haber aceptado los partidos aliados el concurrir a los comicios en la única forma que la ley les permitía hacerlo y haber sido votada la candidatura común equivale a la aceptación por los electores de la fusión o consolidación de ambos partidos en uno solo, pues los votantes de la coalición no eran libres en dejar de votar so pena que sus nombres fueran eliminados de las listas electorales por las dos sucesivas elecciones. De modo que su voto no era libre ni tampoco la cuestión de la fusión, que no estaba sometida a los electores en un referéndum, como se hizo cuando la ley de prohibición. Además, esa cuestión debería haberse sometido a los afiliados a los partidos Unión de Puerto Rico y Republicano Puertorriqueño únicamente y nunca al electorado en general, concediendo así a los partidos adversarios el derecho de intervenir en las cuestiones internas de esos partidos, tales como su disolución y consolidación en otro.

El hecho de que al comunicarse al Secretario Ejecutivo los nombres de los candidatos propuestos se dijera en las cabeceras de las certificaciones que los que las suscribieron eran presidente y secretario de la convención celebrada por el partido Alianza Puertorriqueña, no es prueba de que en las fechas en que están firmadas, agosto y septiembre de 1928, la Alianza Puertorriqueña se había convertido en un partido, porque las certificaciones sólo dan fe de lo que se transcribe de los documentos, y en el cuerpo de lo que se certifica se dice que los candidatos son de la Alianza Puertorriqueña, y no dice que sean del partido Alianza Puertorriqueña: porque las cabeceras de tales certificaciones están en contradicción con el membrete que antes tienen y que dice "Alianza Puertorriqueña", estándolo también con el cuerpo de la certificación en el que se dice que son candidatos de la Alianza Puertorriqueña: porque no existe constancia alguna en los autos de que en las expresadas fechas la Alianza Puertorri-

queña de los dos partidos se hubiese convertido por algún acuerdo de ellos en un solo partido, resultando por el contrario que ellos no han hecho nuevo convenio después del pacto de 1924: y porque esas certificaciones tienen fecha anterior a noviembre de 1928, cuyas elecciones se dice fueron las que convirtieron a la Alianza Puertorriqueña en un partido.

La interpretación que hemos dado a esa ley es la razonable de acuerdo con las reglas de interpretación de leyes fijadas por nuestro Código Civil en sus artículos 14 y 17. Darle la interpretación que sostiene el Secretario Ejecutivo de Puerto Rico es no sólo ir contra las palabras de la ley sino que llevaría a la conclusión de que dicha ley es anticonstitucional, según diremos, yendo así contra la regla bien sentada de que un estatuto deberá ser interpretado de modo tal que de ser posible resulte compatible con la Constitución. *Union Central Life Insurance Co.* v. *Tesorero de Puerto Rico,* 19 D.P.R. 912; *People* v. *Frisbie,* 26 Cal. 135; *People* v. *Hayne,* 83 Cal. 117; *Re Stewart,* 35 L. R. A. 427.

Si se sostuviera que esa ley tuvo el efecto de disolver a los partidos aliados o coaligados Unión de Puerto Rico y Republicano Puertorriqueño y que los convirtió o fusionó (*merged*) en otro nuevo llamado Alianza Puertorriqueña, resultaría esa ley contraria a la Constitución de los Estados Unidos y a nuestra Carta Orgánica, porque entorpece la franquicia electoral a las personas legalmente capacitadas para votar impidiendo su derecho a combinarse libremente.

En efecto impide el coaligarse a los partidos so pena de considerarlos fusionados como alega el Secretario Ejecutivo, sin la voluntad de ellos, en un solo partido; y en el caso de *Martínez Nadal* v. *Saldaña,* 38 D.P.R. 462, dijo este Tribunal que el electorado debe tener entera libertad de combinarse. Además, según hemos dicho antes, lo que se permite a los partidos que estuvieron coaligados en las elecciones de 1924 no se permite a los otros que después se coaligaran. En el

caso de *Murphy* v. *Curry*, 137 Cal. 479, se ha dicho lo siguiente, cuya traducción tomamos del alegato de los peticionarios:

"No .puede haber fundamento sólido, y razonable, por tanto, para privar a un partido político del derecho a poner en su papeleta los nombres de sus candidatos, solamente porque otro partido político haya creído conveniente seleccionar los mismos hombres. Desde el momento que la legislatura, dentro del sistema australiano, ha creído conveniente reconocer a los partidos políticos como entidades y circunscribir su esfera, se ha hecho deber legislativo tratarlos a todos justa e imparcialmente y es injusto, *discriminatorio* e ilegal privar en este caso al Partido Demócrata del derecho de colocar el nombre de su candidato a la Cámara de Representantes en la papeleta oficial . . . . Una injusticia que se acentúa más por el hecho de que en adición a esta denegatoria el estado oficialmente propaga la falsa información a sus electores de que el partido demócrata no tenía candidato alguno para este cargo. Ni aun cuando los derechos del candidato sean considerados se encontrará esta ley más satisfactoria. No es cuestión de 'susceptibilidad partidarista' o 'sentimentalismos partidaristas', sino que dispone de estos derechos barriéndolos por completo. Si se dice que la mera susceptibilidad partidarista o sentimentalismos partidaristas que influyen en los hombres en desear ser conocidos como miembros de determinada organización no sean materias de cuidado alguno constitucional, se ha admitido, no obstante, que cualquier candidato tiene derecho a insistir en que su nombre sea colocado en la papeleta oficial, no solamente en el sitio apropiado sino con las correspondientes palabras impresas para informar al votante de que él es el candidato de determinado partido político. Mr. Ivernash, en este caso tiene el indiscutible derecho, dentro de nuestras leyes electorales, para insistir en que su nombre aparezca en la papeleta oficial como candidato del partido 'Unión Laborista,' y él puede obligar mediante mandamus a hacer efectivo ese derecho. En este caso, por lo tanto, el Estado ha creído conveniente reconocer el deseo de los hombres de ser conocidos como miembros de una determinada organización política y se les ha concedido un derecho judicial exigible. Si es el derecho del candidato que se lleve esa información a los votantes, y si es el deber del estado darles información de que él es la persona elegida por un partido político, ¿por qué privarle la ley del derecho de hacer saber a los electores que es la persona escogida por más de un partido? La contestación a esta pregunta se encontrará al determinar cuál ha sido la intención de los legisladores, o sea, el im-

pedir la combinación o fusión de dos o más partidos políticos mediante la común selección de los mismos candidatos; pero hasta que se nos demuestre que tal combinación o coalición o tal fusión infringe la Constitución de los Estados Unidos o la de este Estado o que es contraria al orden público, tenemos que la legislatura, en este caso, ha tratado de ejercer un control ilegal sobre los partidos políticos y sus candidatos, y al hacerlo así ha inferido un golpe injustificado a un principio vital de nuestro sistema republicano de gobierno.''

En esta decisión se revisa y se discute la doctrina contraria, rechazándola, de la Corte Suprema de Michigan, Ohio y Wisconsin, la primera de las cuales cambió después su doctrina según se dice en el caso de *Matter of Hopper* v. *Britt,* 203 N.Y. 144, que sostiene la teoría citada de California. Véase también *Matter of Callaham,* 93 N. E. 262.

La parte contraria cita resoluciones opuestas a las que anotamos pero seguimos éstas porque nos parece razonable y justo que si un candidato a un cargo electivo tiene la simpatía de varios partidos pueda ser nominado por ellos y no por uno solo.

También la Constitución de los Estados Unidos en su enmienda XIV, al igual que nuestra Carta Orgánica en su sección segunda, prohibe toda legislación que menoscabe la eficacia de las obligaciones contraídas, y la interpretación que se pretende dar a la ley infringiría esas disposiciones fundamentales de nuestra organización porque promulgada la ley que comentamos cuando existía un convenio o alianza en determinadas condiciones impide que la continúen esos partidos. En 12 Corpus Juris 1057 y 1058 se dice que una ley aprobada subsiguientemente a un contrato existente, que de ser válida tendría el efecto de anular el contrato, constituye la forma más palpable de menoscabo legislativo y que tal legislación es claramente anticonstitucional. Si una ley cambia el efecto legal de un contrato, lo menoscaba dentro del sentido de la garantía constitucional. El convenio, contrato, coalición o alianza de los dos partidos se celebró, según hemos visto, cuando la ley lo permitía y no se convino en la

fusión de ambos, condición nueva que impondrían las secciones que examinamos a los que antes habían contratado, alterando así las condiciones de su pacto y disolviéndolos contra su voluntad, quedando de ese modo menoscabado dicho pacto o contrato. 6 R.C.L. 328 y 329. Esta prohibición se aplica no sólo a los contratos regidos por el Código Civil sino también a todo instrumento, ordenanza y medida por cualquier nombre conocida que contenga cualidades inherentes o propósitos de contrato y establezca con éste recíprocas obligaciones de buena fe. En el pacto o alianza de esos dos partidos nada encontramos referente a que se celebrara solamente para las elecciones de 1924, como dice el demandado.

El caso de *Martínez Nadal* v. *Saldaña,* 38 D.P.R. 446, no declaró que el pacto o alianza de los partidos Unión de Puerto Rico y Republicano Puertorriqueño duraba sólo cuatro años, ni podía declararlo porque esa cuestión no le fué sometida. Ese procedimiento de *mandamus* fué interpuesto por el Sr. Martínez Nadal como Presidente del partido político "Constitucional Histórico" con tres fines, uno de los cuales era para que se le permitiese cambiar su nombre por el de "Partido Republicano Puro" a lo que se opuso el interventor "Partido Republicano Puertorriqueño", y habiendo alegado el peticionario que el Partido Republicano tiene convenida una fusión con el Partido Unionista por lo que aquél había perdido su personalidad, dicho interventor "Partido Republicano" contestó por voz del Sr. José Tous Soto que esa fusión no tendrá efecto legal hasta el día en que se celebren las elecciones. Por esto fué que dijo esta corte resolviendo esa controversia que "no importa que el día de las elecciones o posteriormente el otro partido se proponga hacer una fusión con un tercer partido bajo un nombre distinto. El llamado Partido Republicano tiene una existencia legal independiente hasta el mismo día de las elecciones." No dijo esa decisión que la Alianza de los partidos Unión de Puerto Rico y Republicano Puertorriqueño sólo tenía existencia hasta

el día de las elecciones y que por tanto terminaba a los cuatro años de haber sido acordada. Ni el pacto de los partidos, ni la ley, ni esa decisión han declarado tal cosa con respecto a la alianza o coalición de los partidos Unión de Puerto Rico y Republicano Puertorriqueño. Por todo lo expuesto sostenemos la interpretación que al principio hemos dado a la ley, de acuerdo con sus palabras.

Dada la conclusión a que llegamos respecto a que ni por la ley de 1927 ni por la manera en que los partidos coaligados fueron a las elecciones de 1928 quedaron ambos fusionados o consolidados en un nuevo partido, veamos ahora si tal alianza o coalición está subsistente o ha quedado disuelta.

Los partidos políticos son asociaciones voluntarias de electores que tienen una organización y opinión distintivas y comunes, y tratan por medio de su organización de elegir funcionarios y de hacer que sus principios se adopten como norma de gobierno. Así están definidos en *Ex parte Wilson*, 7 Oklahoma Crim. 610, 127 Pac. 444, citado con aprobación en *State ex rel McGrael* v. *Phelps*, 144 Wis. 1, 35 L. R. A. (N.S.) 353; habiendo sido citado el último varias veces en el caso de *Martínez Nadal* v. *Saldaña*, 38 D.P.R. 446. La Ley Electoral reconoce a los partidos políticos en varias de sus disposiciones.

Los partidos políticos pueden asociarse o coaligarse con otros como lo reconoce la ley al disponer que los partidos que en las elecciones de 1924 fueron a las urnas electorales coaligados habrán de hacerlo en determinada forma en las de 1928.

La coalición o alianza de los partidos Unión de Puerto Rico y Republicano Puertorriqueño fué acordada entre ellos sin plazo fijo y sin un asunto determinado y por esto cualquiera de ellos podía dar por terminada tal alianza por acuerdo de su asamblea; pero sin previo acuerdo de las asambleas de los dos partidos no podía verificarse la fusión de ambos en uno solo que llevaría consigo la disolución de los dos para constituir un tercero como suma o fusión de

los dos; ni podían los representantes de cada uno de ellos en la junta directiva de la Alianza verificar una fusión de los dos porque no fueron autorizados para ese fin por las respectivas asambleas de los mismos, pues como delegados, agentes o representantes de sus partidos, no tenían más autoridad que la que les fué conferida. Ni la podía tener la mayoría legislativa aliancista, pues los poderes que le confirió el electorado fueron para legislar para el Pueblo de Puerto Rico y no para la creación o disolución de partidos, que es obra de las colectividades políticas. Las asambleas de los dos partidos nunca acordaron tal fusión y consiguiente disolución de sus respectivos partidos. Eran las únicas que podían hacerlo.

Ahora bien, como una asamblea del partido Unión de Puerto Rico acordó dar por terminada la alianza que había concertado con el partido Republicano Puertorriqueño y así lo notificó al Presidente del segundo de esos partidos y también al Secretario Ejecutivo de Puerto Rico, consecuencia de ello es que desde entonces quedó terminada la coalición o alianza entre ambos y que consiguientemente los dos quedaron en la misma situación que tenían antes de haber sido concertada la alianza, por lo que cada uno recuperó el uso particular de las insignias, emblemas y derechos que respectivamente tenían.

Como se ve, ésta no es una cuestión que debe ser sometida a la decisión del organismo director de los dos partidos aliados, compuesto por miembros de ambos partidos, pues se trata de la resolución de un aliado que no quiere continuar en la alianza, o, en otros términos, de un socio que no quiere continuar en la sociedad.

De lo expuesto se sigue que la Alianza Puertorriqueña de los partidos Unión de Puerto Rico y Republicano Puertorriqueño ya no existe y que por esto el partido Unión de Puerto Rico, que en la oficina del Secretario Ejecutivo de Puerto Rico y en la papeleta electoral ha figurado como partido organizado y de la mayoría durante 27 años, tiene derecho

ahora por la disolución de esa alianza a que su nombre con el emblema e insignias que antes tenía figure en los archivos oficiales del demandado y en la papeleta electoral, y que ése es un deber ministerial impuesto por la ley al Secretario Ejecutivo de Puerto Rico si el número de votos que obtuvo dicho Partido Unionista en la última elección le da derecho a ser partido principal organizado.

Es cierto que a la oficina del Secretario Ejecutivo de Puerto Rico se ha comunicado que la Alianza Puertorriqueña está subsistente y que ella es la única que tiene derecho a usar el nombre de Unión de Puerto Rico, pero aparte de que la primera afirmación está destruída por la forma en que ahora ha sido nombrado el Presidente de la Alianza, por haberse constituído un Comité Insular compuesto por lo menos de 34 miembros entre propietarios y suplentes, todo esto contrario a las bases que en 1924 sirvieron para la alianza, de todos modos se ve que todo esto descansa en la teoría de que la ley y el electorado hicieron una fusión de dos partidos que se coaligaron con el nombre de Alianza Puertorriqueña y que por eso ya no existe el partido Unión de Puerto Rico; teoría y conclusión que antes hemos declarado erróneas.

En la última elección que tuvo lugar en 1928, los partidos Unión de Puerto Rico y Republicano Puertorriqueño votaron la misma candidatura en una sola columna por lo que sus votos están confundidos, pero en una situación bastante análoga a la presente se resolvió por la Corte Suprema de Minnesota en el caso de *Higgins* v. *Berg, Secretary of State,* 42 L.R.A. 245, que dicho Secretario podía recurrir a cualquier regla o medida para averiguar aproximadamente el número de votos emitidos por cada partido que él considerase justa y practicable, para lo cual le sugirió la corte que sacase la proporción del voto combinado entre los partidos sobre la base del tanto por ciento de votos emitidos por cada uno en la elección general anterior a aquélla en que fueron unidos en un "ticket" duplicado, y que a menos que el

Secretario actuara al hacer dicho cómputo fraudulenta o injustamente, o claramente sobre una base imprópia o prejuiciosa, la decisión del Secretario demandado no sería alterada por la corte. Hacemos nuestra esa sugestión de la Corte Suprema de Minnesota por encontrarla justa y equitativa para las partes; y como en la elección anterior de 1924, en que figuraron ambos partidos coaligados en columnas separadas pero teniendo ambos la misma candidatura para todos los cargos, el partido Unión de Puerto Rico tuvo el 81 por ciento de los votos para dicha candidatura y el Partido Republicano Puertorriqueño el 19 por ciento restante, con esos tanto por ciento puede en este caso el demandado determinar el número de votos que en las elecciones de 1928 correspondió a cada uno de los dos partidos coaligados.

Debe librarse el auto de *mandamus* perentorio solicitado en este caso.

OPINIÓN DEL JUEZ ASOCIADO SEÑOR TEXIDOR, CONCURRENTE CON LA OPINIÓN DISIDENTE DEL JUEZ ASOCIADO SEÑOR ALDREY

Estoy en todo conforme con la opinión del Juez Asociado Sr. Aldrey; pero deseo además expresar lo siguiente:

En cuanto a la interpretación de las palabras *"será considerada como un solo partido con las mismas prerrogativas"* y *"en lo sucesivo será considerado como partido principal u organizado de acuerdo con el número de votos que obtenga",* he de empezar por separar lo que hace relación a esta última frase, por lo siguiente:

La Ley de Inscripciones y Elecciones distingue entre partidos principales, y partidos organizados, (sección 14 de dicha Ley de junio 25, 1919) según el número de votos obtenidos. Y a este mismo extremo se refieren las palabras que se han citado, y que aparecen al final del *"Disponiéndose";* el punto carece de importancia para la resolución de este caso.

En cuanto a la primera frase citada, ante toda otra consideración estimo que para obtener su exacta significación,

hemos de estudiarla e investigarla en el idioma español, en que fué redactada, y en que fué tramitada la ley.

Pero los casos de duda, o mejor dicho, de discrepancia entre los textos inglés y castellano (o español) de una ley, la No. 8, 12 de noviembre de 1917, preceptúa que si el estatuto fuese de origen español, se atenderá al texto castellano con preferencia al inglés. Aunque no es imprescindible ampararse en esta ley de hermenéutica, la he citado por si hubiere alguna duda en la materia.

"Considerar", por sí, aisladamente, es tomar en cuenta, prever, dar atención; y puede significar también tratar a una persona con deferencia o atención, según el Diccionario de la lengua castellana por la Real Academia Española.

"Considerar como", forma en que se usa en la ley de que se trata, adicionándole el adverbio, es algo de más amplio sentido. El adverbio "como" puede, según el mismo diccionario, tener el siguiente sentido:

"En sentido comparativo denota idea de equivalencia, semejanza o igualdad, y significa generalmente el modo o la manera que, o el modo o manera de. *Es rubio como el oro; se quedó como muerto; encontró con dos como clérigos o como estudiantes.*" Diccionario antes citado, Edición décimocuarta.

No puede sostenerse que la ley quiso decir que la alianza o coalición de que se trata sería materia de pensamiento o estudio; máxime cuando condiciona el verbo "considerar" con el adverbio "como", no ya revelador, sino declarativo de la intención de la frase. Cuando decimos: "le considero como muerto", "es rubio como el oro", no expresamos que el sujeto ha muerto, o que su cabello es oro; establecemos un término de analogía o de comparación, no una afirmación final como se establecería diciendo "ha muerto" o "esto es oro".

Estamos en el terreno del artículo 13 del Código Civil, que fija una regla de aplicación de la ley, ya que no de rigurosa interpretación.

"Artículo 13.—Cuando la ley es clara y libre de toda ambigüe-

dad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu."

Este precepto legal es constante como materia de jurisprudencia en Estados Unidos, y en Puerto Rico. La doctrina jurídica es que en la interpretación de un estatuto las palabras de uso común deben ser tomadas en su significación natural, llano y corriente; que cuando no hay ambigüedad en el lenguaje no se justifica una desviación de su significado natural, y es el deber del tribunal darle su fuerza y efecto. Véase 36 Cyc. Págs. 1114 y 1115 y notas:

"Para llegar al espíritu o significado de un estatuto, contrato o constitución, debe acudirse primeramente en todos los casos al significado natural de las palabras en el orden gramatical en que los redactores del documento las han colocado. Si las palabras llevan a un significado definido que no envuelve un absurdo ni una contradicción con otras partes del documento, entonces ese significado, aparente de la faz del documento, debe ser aceptado y ni las cortes ni la legislatura tienen el derecho de agregarle o quitarle algo. *Newell* v. *People,* 7 N. Y. 9, 97; *Hills* v. *Chicago,* 60 Illinois, 86; *Denn* v. *Reid,* 10 Pet. 524; *Leonard* v. *Wiseman,* 31 Maryland, 201, 204; *People* v. *Potter,* 47 N. Y. 375; Cooley, Const. Lim. 57; Story on Const. parr. 400; *Beardstown* v. *Virginia,* 76 Illinois, 34. De igual modo cuando una ley está redactada en términos claros e inequívocos, ya sean dichos términos generales o limitados, debe entenderse que la legislatura quiso significar lo que claramente expresó, y, por consiguiente, no hay lugar a interpretaciones. *United States* v. *Fisher,* 2 Cranch, 358, 399; *Doggett* v. *Florida Railroad,* 99 U. S. 72.

❋　　❋　　❋　　❋　　❋　　❋　　❋

"Las palabras son los signos comunes de que se vale el género humano para declarar su intención a los demás; y cuando las palabras de un hombre expresan su significado clara, distinta y perfectamente, no hay ocasión de acudir a ningunos otros medios de interpretación."

Esta doctrina se ha seguido en esta jurisdicción, señaladamente en el caso *Julbe* v. *Guzmán,* 16 D.P.R. 530.

No son dudosas las palabras de la ley. Veamos:

". . . que *los partidos* que en las elecciones . . . podrán inscri-

bir un *nombre general* para dicha alianza o coalición . . . una insignia que contenga las *insignias de cada uno de los partidos aliados o coaligados* . . . que la alianza o coalición que concurra a las urnas bajo un mismo nombre o divisa, *será considerada como un solo partido* con las mismas prerrogativas, derechos y deberes que de acuerdo con la ley *tienen los partidos que la integren.*"

Las itálicas que aparecen en estas citas son nuestras.

Nótese que la ley conserva siempre el plural "los partidos" y que prevé el caso de que ellos, los dos, concurran a una elección aliados; que les da el derecho de usar una insignia, la de la alianza, conteniendo las dos de los partidos aliados, a los que de ese modo reconoce en su subsistencia, después de la alianza o coalición; y que les da después, aliados, la consideración de un solo partido, para el que no crea nada nuevo en derechos, prerrogativas y deberes, sino que mantienen, no las que *tenían,* sino las que tienen dentro de la ley.

Si la ley hubiera intentado fundir en uno esos dos partidos, ni conservaría el plural "los partidos", ni dejaría subsistir las insignias de cada partido, coexistiendo con la de la coalición. Si hubiera querido declarar la extinción de los partidos, pudo decirlo, y de una manera inequívoca. Lo que hizo, reconociendo la vida propia de cada partido, fué dar a su conjunción la consideración de un partido político. Las palabras "será considerada como" referidas a la alianza o coalición, no significan que los partidos que la constituyen hayan cesado de existir, sino que las resultantes de la inteligencia, coalición o alianza, será tanto *como* si fuera un partido. El adverbio "como" es quizá la clave de toda esta cuestión; desde luego en relación con la palabra que le precede.

No hay que buscar interpretación allí donde las palabras y los conceptos son claros, y su significado preciso y terminante. Ese es el sentido de la jurisprudencia que acabo de citar.

No deseo evitar entrar en el terreno de la forma de entender el término en el idioma inglés.

En *Wason* v. *Rowe,* 16 Vt. 525, 528, se estableció que las palabras ''considerado como'' no envolvían un compromiso o una garantía de que el animal vendido estuviera sano, fijando así la diferencia entre la consideración de un hecho, y la realidad del hecho mismo.

La aplicación literal del precepto de ley en este caso, es completamente opuesta a la teoría de la fusión de los partidos en uno.

Si creyéramos que las palabras y frases de la ley son dudosas, tendríamos que acudir, para interpretarlas, al sistema del artículo 16 de nuestro Código Civil.

''Artículo 16.—Cuando las palabras de una ley son dudosas, su sentido debe ser buscado por el examen y comparación de las frases dudosas con otras palabras y sentencias que les estén relacionadas, en el orden de una buena investigación, para llegar a su verdadero significado.''

Hemos presentado antes frases y palabras del *''Disponiéndose''* del artículo 42, que relacionadamente hacen imposible interpretar el precepto en el sentido de la creación de un partido como resultante de la coalición o alianza de los otros dos. El citar a éstos siempre como *los partidos,* el conservar las insignias propias de cada uno dentro de la temporal y general de la coalición o alianza, y el uso de la expresión ''considerada como'', relevan de toda duda.

Pero yendo más hacia el principio del precepto legal, encontramos que se habla de *los partidos* que en elección anterior fueron a las urnas aliados, esto es de entidades distintas que en la última época electoral unieron sus esfuerzos y sus fuerzas; y se les autoriza para que en las próximas elecciones puedan inscribir un nombre general, con una insignia que contenga las de los aliados, etc.

Si la ley hubiera querido hacer desaparecer las alianzas o coaliciones, y que los antes aliados no conservaran su propia personalidad, tuvo un gran número de formas de expre-

sión de tal propósito. Y lejos de ello, autorizó a los partidos en la forma que en el artículo 42 aparece.

El artículo 18 del Código Civil, presenta otro sistema de interpretación. Veamos:

"Artículo 18.—El medio más eficaz y universal para descubrir el verdadero sentido de una ley cuando sus expresiones son dudosas, es considerar la razón y espíritu de ella, o la causa o motivos que indujeron al poder legislativo a dictarla."

Ante todo, conviene consignar que el sistema es de aplicación cuando las expresiones de la ley son dudosas; lo que revela el respeto a la interpretación literal, cuando la ley es clara.

Acerca de la razón y espíritu de la ley, se ha dicho bastante en la opinión del Juez asociado Señor Aldrey, en la que concurro.

Se nos han citado autoridades para sostener la doctrina jurídica que establece que si el estatuto es susceptible de dos interpretaciones, una de ellas compatible con los derechos y limitaciones de la Constitución, e incompatible la otra, es deber de la corte seguir la primera.

En realidad, el principio no es más que una modalidad del que sostiene que en los casos de duda, la interpretación debe ser la que haga eficaz el estatuto como realidad jurídica. En el caso *Ex Parte Dones,* 10 D.P.R. 179, este Tribunal dijo:

"En harmonía con todas las reglas de interpretación, los tribunales están en el deber de interpretar las leyes de tal manera que den efecto a todas sus partes."

Pero ciñéndonos al punto en cuestión, es indudable que en los casos en que es necesario interpretar, hay que seguir una norma que nos lleve a la constitucionalidad de la ley, donde ella es posible. Y es innegable que la ley no puede, administrativamente, disolver un partido político, y menos aún, convertir en un solo y único cuerpo político la alianza o coalición de otros varios, que no quieren ser uno en esencia, sino laborar unidos temporalmente y para determinados

fines, preservando íntegras sus propias individualidades y personalidades.

Se ha dicho que si una ley cambia el efecto legal de un contrato, lo menoscaba en el sentido de la garantía constitucional.

En el caso de dos o más partidos políticos que se alían o coaligan, no que se funden en uno, hay, desde luego, las personas colectivas, o legales, que son los partidos, que manifiestan su voluntad o consentimiento para un objeto lícito (alianza o coalición) y con una causa también lícita (el interés de los contratantes en hacer triunfar sus credos políticos). Contrato hay, ya que concurren los requisitos indispensables para ello. Y mientras esos contratantes no se salgan de la ley y no se pongan al margen de ella, su voluntad es la que impera en la vida y en el desarrollo de ese contrato. No puede una ley posterior a aquel contrato, variar, modificar, en forma alguna sus efectos legales, y menos su naturaleza e íntima esencia, sin que esa ley viole el precepto constitucional consignado como la más alta garantía de la libertad individual en materia de contratación.

De los hechos que aquí se probaron, resalta la afirmación de que aquellos dos partidos al aliarse, no quisieron perder sus individualidades, antes al contrario, demostraron, por los pactos de su contrato, y por los hechos posteriores, su voluntad de conservar tales personalidades e individualidades, a pesar del convenio, limitado siempre por esa voluntad de subsistir. La interpretación que se diera en otra forma, sería para afirmar que la ley electoral tenía el poder de destruir aquella voluntad y aquellas aspiraciones tan bien marcadas y sostenidas en el contrato mismo. Y sería también para declarar que los que realizan el pacto por su voluntad y en sus asambleas como expresión de tal voluntad, destruían ese pacto por una ley votada por ellos mismos, lo que sería una conducta verdaderamente absurda.

Roto el pacto, disuelta la alianza o coalición, los signos o enseñas que tan cuidadosamente se conservaron al consti-

tuirse aquélla, y que siguen conservándose en las leyes electorales, pertenecen a los distintos partidos, a los que, si observamos la ley, y si nos atenemos a la prueba, nunca dejaron de pertenecer. Estudiamos estos hechos como ellos aparecen del récord.

No puedo concurrir con la idea de que la naturaleza especial, fines y propósitos de la alianza o coalición de que se trata, fijen el período de duración de ésta en cuatro años o cualquier otro plazo. Del pacto no aparece nada que limite su duración; ni la voluntad de las partes, que no se ha exteriorizado en ese sentido, ni la finalidad del convenio, en forma que limite la existencia de la alianza, como si, por ejemplo, se hubiera realizado ésta para las elecciones de un año determinado.

La expresión del nombre "Alianza Puertorriqueña" en un número de certificados de convención suscritos por personalidades eminentes en la Unión de Puerto Rico, o en la Alianza, no puede llevarme a creer que la fusión o consolidación de los dos partidos era un hecho. Como aparece en estos autos, al celebrarse el pacto las asambleas de los partidos contratantes guardaron cuidadosamente la existencia individual y separada de cada partido; y no aparece que esas asambleas en alguna otra posterior, hayan delegado su soberanía en los señores Barceló o Córdova Dávila, para realizar, con su expresión en las certificaciones, o en cualquiera otra forma, una consolidación, unificación o fusión a la que de una manera clara no quisieron ir al pactar. Aparte de que, dado que en agosto de 1928, una asamblea de la Alianza Puertorriqueña acordó ir a las elecciones bajo un solo *ticket* y una insignia, pero como "Alianza Puertorriqueña de los Partidos Unión de Puerto Rico y Republicano Puertorriqueño", y asimismo usar el nombre abreviado "Alianza Puertorriqueña", lo que en verdad explica sencilla y fácilmente el uso de ese nombre en certificaciones expedidas por personalidades como las que se citan; pero se advierte cómo, después de hallarse en vigor el artículo 42

enmendado de la ley electoral, esta conjunción o alianza sigue conservando, y conservando para las elecciones, y como componente de la alianza los nombres Unión de Puerto Rico y Republicano Puertorriqueño, que aparecen en el acuerdo de la asamblea de 1928, y que van a la papeleta electoral formando parte del título de la Alianza. Y el electorado, al votar esa papeleta, ve en ella esos dos nombres, y no el de un partido nuevo; y lógicamente ha de deducirse que los electores unionistas cuando votan ven en la papeleta el nombre de la Unión de Puerto Rico y los republicanos puertorriqueños en la misma forma. No puedo creer que el electorado, al votar los candidatos para determinados cargos ha ido más allá de la designación.